## STRAUGHAN *v.* TSOUVALOS AND TSOUVALOS

[No. 104, September Term, 1966.]

*Decided April 7, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER and McWILLIAMS, JJ., and MURPHY and THOMPSON, JJ., Chief Judge and Associate Judge of the Court of Special Appeals, respectively, specially assigned.

*Frederick J. Green, Jr.*, with whom were *Lord, Whip, Coughlan & Green* on the brief, for appellant.

*Peter G. Angelos* for appellees.

MURPHY, J., by special assignment, delivered the opinion of the Court.

Chryson Tsouvalos and her husband, James, an elderly Greek couple (65 and 73 years of age respectively when the accident occurred), were struck by an automobile owned and operated by appellant Straughan on January 16, 1963 as they were walking across Eastern Avenue near its intersection with Oldham Street in Baltimore City. A jury in the Superior Court of Baltimore City awarded damages to Mrs. Tsouvalos for her injuries in the amount of $6,300 and awarded $3,700 to Mr. Tsouvalos for his wife's medical and hospital expenses and for his loss of her services. The lower court entered an order granting a new trial unless Mrs. Tsouvalos filed a remittitur in the amount of $800 and Mr. Tsouvalos a remittitur in the amount of $1,200. The remittiturs were filed, and judgments were entered in favor of Mr. and Mrs. Tsouvalos in the respective amounts of $5,500 and $2,500. From those judgments Straughan has appealed to this Court, contending that the lower court erred in its instructions to the jury, and in admitting certain testimony at the trial.

The essential facts are these: Appellees had left their home on the morning of the accident to walk to their bank on Eastern Avenue. They walked in an easterly direction on the south side of Eastern Avenue, arriving at the southeast corner of the intersection of Eastern Avenue and Oldham Street at approximately 11:10 a.m., at which time they prepared to cross to the northeast corner. The intersection is controlled by an automatic traffic light and there is a ten foot marked pedestrian crosswalk from the southeast to the northeast corner. Oldham Street runs north and south and is fifty-six feet wide south of Eastern Avenue, but only forty-three feet wide north of Eastern Avenue. At this point, Eastern Avenue consists of four ten-foot lanes, two eastbound and two westbound.

At approximately the same time that appellees were standing on the southeast corner of the intersection, the appellant, who was southbound on Oldham Street, had stopped his ve-

hicle for a red light at Eastern Avenue. When the light turned green for traffic on Oldham Street, appellant made a left turn to proceed in an easterly direction on Eastern Avenue and, in so doing, the right front bumper of his automobile struck the appellees who, when the light turned to red, for traffic on Eastern Avenue, began crossing from the southeast to the northeast corner of the intersection.

The investigating police officer arrived at the scene of the accident after appellees had been taken by ambulance to the hospital. Appellant gave the officer a written statement at that time indicating therein that he was proceeding about fifteen miles per hour when the accident occurred; that he struck appellees at a point about ten feet north of the south curb line of Eastern Avenue and fifteen feet east of the southeast curb line; and that he did not see appellees "until they stepped from the curb."

Mrs. Tsouvalos, who did not speak English well, testified at the trial through a duly sworn interpreter. She stated that she and her husband began to cross Eastern Avenue when the traffic light turned in her favor. She testified that before they started across the street she saw that the light was in her favor and that there was no traffic; that had there been traffic, she would not have crossed; that "I stepped down on the street from the sidewalk and I saw the car coming, and we were hollering at him to stop, stop, but he did not stop, but he strike us and threw us on the street"; and that the automobile was "coming from Oldham Street, cross Eastern Avenue and came to the corner." When asked how far away appellant's vehicle was when she first saw it, she responded by equating the distance with that of the width of Eastern Avenue. In response to the further question of whether, when she first saw appellant's automobile, it was "farther away" than the length of a ten foot table or of a sixteen foot room, she answered: "About that it had to be." Mr. Tsouvalos, also testifying through the interpreter, stated that when the light turned in their favor he and his wife "stepped immediately down" and started walking in the crosswalk, and had proceeded "about six or seven feet" after which "all sudden like, a car came on us and strike us." He further testified that before stepping into the street he

looked left and right, but saw the appellant's vehicle "for the first time when it came to, just to strike us, about six or seven feet in the street, it all, all sudden like."

Appellant testified that his vehicle was the first in line waiting for the red light on Eastern Avenue to change to green; that when the light changed he looked for northbound traffic on Oldham Street, but there was none coming; that he looked for pedestrians, but there were none; that he then proceeded to make his left turn, and "as I was coming up then I seen Mr. and Mrs. Tsouvalos and I applied my brake." Appellant further testified: "When I was traveling east, after I made my turn, that's when I seen them"; that he first saw appellees when they were in the street "about four to five feet from the curb"; and that he was then "practically on top of them" and although he applied his brakes he could not stop. He also testified that although he told the police officer that he was going fifteen miles per hour, he wasn't sure of his speed, but wasn't traveling fast.

There was a conflict in the evidence as to whether appellees were within the pedestrian crosswalk or several feet east of it when the impact occurred. An eyewitness who observed the accident from a considerable distance placed appellees within the crosswalk, as did the testimony of appellees themselves. Appellant placed appellees several feet east of the crosswalk at the time of the accident. There was evidence showing that after the impact, appellant's vehicle moved ahead only six to eight inches, leaving no skid marks; that the front of appellant's vehicle came to rest five or six feet east of the east side of the crosswalk; that Mrs. Tsouvalos was thrown by the impact of the collision about eight to ten feet and that she and her husband had come to rest in the street about seventeen feet east of the southeast curb line and eight feet north of the south curb line in Eastern Avenue.

## I

Appellant advanced the theory at trial that the evidence permitted a finding that Mrs. Tsouvalos (and her husband) had begun crossing in the crosswalk at a time when appellant's vehicle was in such close proximity that he could not, in the exercise of ordinary care, bring his vehicle to stop in time to

avoid the collision. He embodied this theory in his second and third requests for instructions as follows:

"2. If the jury find that the accident happened within the pedestrians crosswalk, then even though the defendant did not have the right of way, he was entitled to proceed forward on the assumption that a pedestrian, then crossing within the crosswalk, would not begin to do so at a time when the defendant's vehicle was in such close proximity to the pedestrian that he, in the exercise of ordinary care, could not bring his vehicle to a stop in time to avoid the accident, then the plaintiff was guilty of contributory negligence and the verdict of the jury must be for the defendant.

"3. Even though pedestrians have the right of way within the crosswalk, the driver of a vehicle is entitled to assume that a pedestrian will not assert his right-of-way and attempt to cross the street at a time when the defendant could not, in the exercise of ordinary care, stop his vehicle in time to avoid striking the pedestrian."

The trial judge declined to grant the requested instructions or to incorporate their basic substance in his charge to the jury. Appellant contends that the court's action constituted reversible error. We do not agree.

Code (1957), Article 66½, Section 193 (a)(1)(2) provides that whenever traffic is controlled by signals exhibiting different colored lights successively, all vehicles shall yield the right of way to pedestrians lawfully within the intersection at the time such signal is exhibited, and that pedestrians facing the signal may proceed across the roadway within any marked or unmarked crosswalk. Under this statute and predecessor statutes of like import, it has been repeatedly held that a pedestrian has a right to assume that the motorist will obey the law and yield the right of way to him; in other words, a pedestrian favored as to right of way is not bound to anticipate or required to foresee that his rights would not be honored. *Folck v. Anthony*, 228 Md. 73 (1962); *Jackson v. Yellow Cab Co.*, 222 Md. 367 (1960); *Henderson v. Brown*, 214 Md. 463

(1957) ; *Caryl v. Baltimore Transit Co.,* 190 Md. 162 (1948). On the other hand, a pedestrian at a crosswalk is not free from obligation to observe the rule of due care and caution to avoid injury. *Sun Cab Co. v. Cialkowski,* 217 Md. 253 (1958) ; *Chasanow v. Smouse,* 168 Md. 629 (1935). Hence, before entering the intersection at the crosswalk, the pedestrian must use due care to look for oncoming vehicles, since he cannot place himself directly in the path of oncoming traffic in blind indifference to his situation. *Baker v. Commissioner,* 228 Md. 454 (1962) ; *Legum v. State,* 167 Md. 339 (1934). This does not mean that the pedestrian, having looked as he started to cross, and the way appearing clear, must continue to look up and down the street during the course of the crossing, since as previously indicated he is entitled to assume that an oncoming vehicle would respect his right of way. *Henderson v. Brown, supra; Wintrobe v. Hart,* 178 Md. 289 (1940) ; *Sheriff Motor Co. v. State,* 169 Md. 79 (1935). Conversely, even though only ordinary care is required of the motorist, in approaching a pedestrian crosswalk which is likely to be used by persons under circumstances requiring the motorist to yield to the pedestrian's right of way, he is required to anticipate the presence of pedestrians in the crosswalk and to exercise much greater vigilance and caution to look out for such a pedestrian than the pedestrian is required to exercise to look out for the motorist. *Heffner v. Admiral Taxi Service, Inc.,* 196 Md. 465 (1950) ; *Wintrobe v. Hart, supra; Merrifield v. Hoffberger,* 147 Md. 134 (1925). It is, therefore, incumbent upon the motorist not only to be continuously watchful for the possible presence of persons on the crossing, but to have the speed of his vehicle so reduced and controlled that it can be readily stopped or diverted in time to avoid a collision with a pedestrian in the crosswalk who might be exposed to such danger. *Sugar v. Hafele,* 179 Md. 75 (1941) ; *Merrifield v. Hoffberger, supra.*

Appellant acknowledges that a prayer similar in substance to the instructions now in question was denied in *Wintrobe.* In that case, as here, a pedestrian having the right of way in a crosswalk was struck by a motorist making a left turn into the intersection. The pedestrian had looked, saw no vehicles coming and started across the intersection with the light in her

favor. The motorist, proceeding at about fifteen miles per hour, was unable to stop in time to avoid colliding with the pedestrian. The lower court instructed the jury that if it found from the evidence "that the plaintiff stepped or walked into the path or side of the defendant's automobile at a time when it was so that by the exercise of ordinary care and caution, the driver of said automobile could not bring same to a stop in time to avoid the accident complained of, then the defendant is not liable." We held that it was error to grant such an instruction since the motorist was required to anticipate the presence of pedestrians at the crosswalk, and the circumstances were there such that the motorist was required to yield the right of way. Similarly, in *Sun Cab Co. v. Cialkowski, supra,* the pedestrian having the right of way was struck by a motorist in the crosswalk in a street intersection controlled by traffic lights. The evidence showed that the pedestrian had looked and observed the defendant's vehicle about three quarters of a block away. The pedestrian was struck when he was about six feet into the street. The defendant contended, as appellant here contends, that the plaintiff was contributorily negligent because he stepped into the path of his vehicle at a time when he was so close that he could not stop in time to avoid the accident. He sought an instruction that regardless of whether it was the pedestrian's duty to look for oncoming traffic, if he did look for such traffic but failed to see it, then nevertheless the pedestrian was guilty of contributory negligence. Under the circumstances of that case, we held that such an instruction would have been improper in view of *Wintrobe.*

As in *Wintrobe,* we find an insufficient evidentiary predicate to justify granting the requested instructions. The uncontradicted evidence indicated that the aged appellees began crossing Eastern Avenue when the light changed in their favor (having looked for oncoming traffic) and had traversed approximately one lane (10 feet) of traffic on Eastern Avenue when struck. Neither the appellant's testimony that he had looked for crossing pedestrians and had seen none, nor Mrs. Tsouvalos's testimony that she was struck as "we just stepped down" would constitute legally sufficient evidence to entitle appellant to an instruction that, although he did not have the right of way, he

could nevertheless proceed through the intersection on the assumption that no pedestrian would begin to exercise his right of way at a time when the motorist could not possibly stop to avoid a collision. Nor would the coupling of this testimony with appellant's further testimony that he was "practically on top" of appellees when he first saw them, provide sufficient evidentiary foundation upon which such a prayer could be based. And we emphatically reject appellant's interpretation of Mr. Tsouvalos's testimony to the effect that appellees stepped into the street at a time when appellant's vehicle was only five feet from them. Mr. Tsouvalos's testimony, as we read it, was that he saw appellant's vehicle for the first time when he was some five to seven feet out into the street. We, therefore, find no error in the court's refusal to grant appellant's second and third requests for instructions.

## II

Appellant also contends that the following portion of the court's charge constituted an incorrect and prejudicial statement of the law:—

> "A motorist is bound to constantly observe the highway in front of him so as to discover persons thereon and to avoid striking them *and to keep his motor vehicle under such control that he may readily operate it or stop it to avoid a collision."* (Emphasis supplied)

Appellant argues that the correct rule is set forth in *Deford v. Lohmeyer,* 147 Md. 472 (1925) as follows:

> "It is the duty of the driver of a motor vehicle, in approaching a street crossing, to have the speed of the car so reduced, and to keep it under such control, as to obviate, *so far as reasonably possible,* the danger of collision with persons crossing the street on foot." (Emphasis supplied)

The disputed part of the court's charge appears based upon language appearing in *Merrifield v. Hoffberger, supra* and *Sheer v. Rathje,* 174 Md. 79 (1938). In *Merrifield* we stated (p. 140) that "drivers of automobiles, when approaching street crossings and passing over the way used by pedestrians, must slacken

the speed of the automobile and have the same under such control as to be able to avoid a collision with a pedestrian, either by stopping the automobile or diverting its course." We further stated in that case at p. 141 that "at crossings all drivers, particularly of motor vehicles, must be highly vigilant and maintain such control that on the shortest possible notice they can stop their cars so as to prevent injury to pedestrians." In *Sheer* we said (pp. 83-84) that it was incumbent upon the motorist at a street crossing "to be continuously watchful for the possible presence of persons on the crossing, and to have the speed of the car so reduced and controlled that it could be readily stopped or diverted in time to avoid collision with pedestrians who might be exposed to such a danger." The rule in *Sheer* was stated in identical terms in *Sugar v. Hafele, supra.* On the other hand, the language in *Deford* was followed in *Heffner v. Admiral Taxi Service, Inc., supra,* and *Henkelmann v. Insurance Co.,* 180 Md. 591 (1942). *Henkelmann* cites *Merrifield* and *Sheer* as authority, while *Sugar* cites *Sheer* as its authority. In our view there is no substantial difference, either in essence or effect, between the cases with respect to the motorist's duty upon approaching a street intersection. The language in *Deford* gives express recognition to the purpose or object of imposing such specific duty of care on the motorist at the street intersection—that is, to avoid injury so far as reasonably possible—and was not intended as the standard, gauge or measure of the responsibility or duty of the driver to anticipate the presence of pedestrians at the crosswalk, and to have his vehicle under such control as to be able to avoid a collision. We think the applicable law was adequately covered by the court's charge to the jury.

### III

Appellant next contends that the court erred when it gave instructions to the jury with respect to the specific duties of pedestrians crossing between street intersections, but failed to specify, other than generally, the duties of pedestrians crossing within the crosswalk. Appellant claims that such failure was clearly prejudicial since, at trial, he was strenuously urging the view that it was the legal duty of the pedestrian having the

right of way at a crosswalk to nevertheless look for oncoming traffic and heed what was seen.

The court specifically instructed the jury that a pedestrian crossing between intersections is guilty of contributory negligence if he fails to look for approaching vehicles, or if having looked, he fails to see such a vehicle and guard against being struck by it. The court stated in less specific terms that "the advantage or preference which the pedestrian has within the crosswalk does not absolve her from the duty to observe the rule of due care and caution to avoid injury." Further charging the jury, the court added:

> "* * * in the final analysis you are instructed that under the law the person having the right-of-way whether in this case it be the plaintiff, Mrs. Tsouvalos, or the defendant, Mr. Straughan, depending on where you find the accident occurred, this person with the right-of-way cannot proceed without regard to the conditions existing at the time and place in question, but must exercise the care which a reasonable and prudent person would use under those same conditions."

While it may have been preferable to have charged the jury specifically with respect to the duty of the pedestrian in a crosswalk to look for approaching traffic before crossing, we do not believe, in view of the court's general statement concerning the pedestrian's duty of care at the crosswalk, that the charge as given was prejudicially inadequate. Taken in its entirety, we think Judge Grady's charge to the jury on the law governing liability was exceptionally lucid, and provided an excellent outline of applicable legal principles within which appellant was free to argue his contentions to the jury.

## IV

Appellant further contends that the court erred in permitting Dr. Padussis, Mrs. Tsouvalos's treating physician, to testify over objection that she had "a fifteen to twenty per cent permanent partial disability of her body as a whole resulting from the trauma of January 16, 1963." In so testifying, Dr. Padussis had responded to the following inquiry:

"Now, on the basis of the course of treatment that you prescribed, Doctor, and your observations of this individual, your care and supervision of her, can you say with a reasonable degree of medical certainty whether or not Mrs. Tsouvalos, as a result of the injuries you outlined, sustained any permanent disability to her limbs, her body, or in her general physical condition?"

The record indicates that Dr. Padussis had expressed his opinion after testifying as to the nature and extent of Mrs. Tsouvalos's complaints and injuries, the course of her treatment, and the relationship between her injuries and the accident. Appellant argues that since Dr. Padussis did not specifically testify as to anatomical disability, or inability of Mrs. Tsouvalos to use any part of her body as a result of the accident, he should not have been permitted to express an opinion as to a percentage of permanent partial disability of the body as a whole. We think the testimony was properly admitted under the rule in *Shivers v. Carnaggio,* 223 Md. 585 (1960), which permits a physician who, in addition to his medical knowledge, has familiarity with and an understanding of the activities and occupation of his patient, to express an opinion as to the extent to which the anatomical disability would cause personal or economic disability. Dr. Padussis was Mrs. Tsouvalos's treating physician over an extended period of time, both in and out of the hospital, and he had seen her on numerous occasions and continued to treat her for high blood pressure up to the date of trial. Under these circumstances, and bearing in mind that Mrs. Tsouvalos's vocation is that of a housewife, we think Dr. Padussis would have sufficient familiarity with the patient's activities to enable him to express an opinion as to the extent to which her injuries caused personal or economic loss. The situation here is not unlike that in *Shivers* where the plaintiff was a housewife and the testifying physician had treated her on numerous occasions. See also *Hebner v. Powell,* 177 Md. 237 (1938).

## V

Appellant also objects to Dr. Padussis's testimony on the ground that he had no factual basis for testifying at the time of

trial as to Mrs. Tsouvalos's present or future physical condition, since his last examination of her was approximately thirteen months prior to trial. Appellant relies on *Mt. Royal Cab Co. v. Dolan,* 166 Md. 581 (1934), where we held that it was error to allow a physician, who had treated the plaintiff four times within twelve days of the occurrence of the injury, but not thereafter, to testify at the trial seven months later as to the probable result of plaintiff's condition. In that case, we noted that there was no testimony whatsoever to show the physical condition of the plaintiff at any time after the physician's last examination, or at trial. Unlike the situation in *Dolan,* Mrs. Tsouvalos's condition appeared to have reached optimum medical healing at the time of Dr. Padussis's last examination, and since he had observed and treated her condition for a period of twenty-one months, we think he had a firm foundation upon which to express an opinion as to the percentage of permanent partial disability sustained by her.

## VI

Appellant next contends that the lower court erred in failing to instruct the jury, as requested by him, essentially as follows:

(a) That there was no legally sufficient evidence that Mrs. Tsouvalos sustained any permanent injury to her chest or ribs.

(b) That there was no legally sufficient evidence that Mrs. Tsouvalos sustained any permanent injury to her legs or any portion thereof except for scars on both knees; and there was no evidence that she sustained any injury or disability to her legs other than damage to the soft tissues of the knees.

(c) That there was no legally sufficient evidence that Mrs. Tsouvalos's present complaints of inability or reduced ability to walk, her complaints of weakness and pain in her legs, and her alleged present and past inability to perform her household chores resulted from the happening of the accident.

(d) That there was no legally sufficient evidence to prove that the accident affected in any way Mrs.

Tsouvalos's pre-existing hypertensive cardiovascular condition, her arteriosclerotic condition, the lack of blood supply to her heart, her hyperthrophic arthritis and her disc disease.

These contentions necessitate a review of the pertinent evidence adduced at the trial.

The testimony showed that Mrs. Tsouvalos, who had been thrown eight to ten feet by the collision with appellant's vehicle, and thereby rendered unconscious, was hospitalized for eleven days under the care of Dr. Padussis who treated her for multiple complaints, including three or four fractured ribs, injuries to both knees, pain and weakness in her legs, back and chest pains, and high blood pressure. There was evidence showing that after her discharge from the hospital, Mrs. Tsouvalos was completely bedridden for at least three months at the home of her daughter, during which time she constantly complained of pain. There was also evidence tending to show that when she returned to her own home, she was unable to do any heavy housework, had difficulty standing and walking, and presently "drags" one leg when she walks.

Dr. Padussis testified that although Mrs. Tsouvalos's fractured ribs had healed, she nevertheless suffered from a pleuritic type of pain resulting from such fractures, which by necessary implication, he included as a part of his estimate of permanent partial disability. He further testified that Mrs. Tsouvalos suffered deep cuts or abrasions to her knees; that they became infected, and although they subsequently healed by granulation, surgery was nonetheless required to remove the scar formations thereon; and that she could not kneel on her right knee. Dr. Padussis testified to continuing complaints of pain and weakness in her legs, especially of the right knee area; to complaints of back pains, which he attributed to the accident; and although he indicated that Mrs. Tsouvalos had pre-existing hyperthrophic arthritis in the thoracic and lumbar back which could have been responsible for such pain, he gave some indication that the back pain could have been induced by the accident. Finally, he testified that an electrocardiogram taken immediately after the accident indicated enlargement of the heart with changes

indicating poor circulation to the posterior part of the heart muscle. He stated that while he couldn't evaluate whether this damaged her heart, the accident aggravated her pre-existing hypertension to a degree which he characterized as being "questionable" and not purely temporary. Another witness for appellees, Dr. Sindler, agreed that Mrs. Tsouvalos's pre-existing arthritis and disc disease could have been aggravated by a severe trauma. Dr. Alfonso, a witness for appellant, testified that Mrs. Tsouvalos had a ten per cent permanent partial disability of her body as a result of her fractured ribs and back complaints, which he characterized as being almost entirely subjective.

We have consistently rejected the proposition that the jury may form a judgment or conclusion on the basis of testimony which admits of mere possibilities. The test to be applied, whether the question involved be the existence of an injury or its cause, is reasonable probability or reasonable certainty. *Ager v. Baltimore Transit Co.*, 213 Md. 414 (1957). Before it can be said that the effect of an injury is permanent, it must appear that it is caused by some condition caused by the injury which is not likely to change, but absent expert testimony such an inference cannot be drawn from the condition itself, when it is accompanied by no physical impairment or defect, and offers no intrinsic indicia of its probable duration. *Mangione v. Snead*, 173 Md. 33 (1937). As we observed in *Wilhelm v. State Traffic Commission*, 230 Md. 91 (1962), at p. 99:

> "There are unquestionably many occasions where the causal connection between a Defendant's negligence and a disability claimed by a Plaintiff does not need to be established by expert testimony, particularly is this true when it develops coincidental with, or within a reasonable time after the negligent act, or where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen."

Applying these legal principles to the evidence in the case, we conclude:

(a) The testimony of Dr. Padussis and Dr. Alfonso was such as to preclude the trial judge from instructing the jury that there was no evidence of permanent injury to Mrs. Tsouvalos's chest or ribs. The fact that she testified at trial that "everything is all right except my leg here" would not justify the requested instruction that she suffered no permanent injury to her ribs or chest in view of the medical testimony to the contrary.[1]

(b) The medical testimony heretofore delineated concerning injury to and weakness in Mrs. Tsouvalos's knees and legs (which Dr. Padussis appeared to have considered in arriving at his estimate of permanent partial disability), coupled with her testimony, and that of her daughter and husband, that she drags her leg when she walks, has difficulty standing, and is unable to walk any distance, was such as to legally preclude the trial judge from peremptorily instructing the jury that she sustained no permanent injury to her legs, or any disability thereto, other than damage to the soft tissues of the knee. See *Hebner v. Powell, supra; Cluster v. Upton*, 165 Md. 566 (1933) and *Wash. B. & A. RR. Co. v. Cross*, 142 Md. 500 (1923).

(c) We think there was legally sufficient evidence to permit the jury to consider the causal relation between the accident and Mrs. Tsouvalos's subsequently alleged leg complaints, her reduced ability to walk and to perform her household chores. Under the circumstances of this case, and bearing in mind that the claimed disabilities arose within a reasonable time after the accident, we do not believe that expert testimony beyond that presented at trial was necessary to establish such causal connection. Indeed, the law of this State recognizes that causal connection between negligence and injury need not always be shown solely by expert testimony.[2] See *Hughes v. Carter*, 236 Md. 484 (1964); *Charlton Bros. v. Garrettson*, 188 Md. 85 (1947). We see no error in this case in admitting the testimony of Mrs. Tsouvalos's daughter concerning her observa-

---

1. Appellees suggest that this testimony is typical of an elderly woman who has sustained injuries with which she has learned to live; that the reason Mrs. Tsouvalos indicated that only her leg bothered her was because her mobility is presently restricted.

2. Appellant's eleventh requested instruction, urging a contrary view of the law, was also properly rejected.

tions of her mother's restricted ability both to work and to walk. See *Wilhelm v. State Traffic Commission, supra.*

(d) Appellant concedes that Dr. Padussis's testimony would support a finding that there had been an aggravation of Mrs. Tsouvalos's pre-existing back condition. Additionally, Dr. Alfonso attributed part of his disability rating to Mrs. Tsouvalos's back condition. Furthermore, Dr. Padussis testified unequivocably that the accident aggravated her high blood pressure. It would have been error, therefore, had the trial judge granted appellant's requested instruction in the form in which presented, i.e., that the accident did not affect "in any way" these conditions. We do agree with appellant that there was no proof of permanent damage to the heart or any direct evidence that the accident affected Mrs. Tsouvalos's arteriosclerotic condition. We believe, however, that the court's charge adequately covered these matters when the jury was instructed that the plaintiff was not entitled to damages for any bodily ailment or disability which resulted from some bodily condition existing prior to the accident, or which resulted from causes not related to the accident.

It is, of course, axiomatic that the court need not instruct the jury with respect to every detail in a case. To hold otherwise could lead to requests for "myriad infinitesimal elaborations, better calculated to confuse than to clarify." See *Ager v. Baltimore Transit Co., supra.* We find no error in the court's charge as given, but on the contrary believe that it fairly and comprehensively covered the subject matter of the case.

*Judgment affirmed, with costs.*