O'DOHERTY ET UX., ETC. *v.* CATONSVILLE
PLUMBING AND HEATING COMPANY,
INC.

[No. 468, September Term, 1970.]

*Decided June 29, 1971.*

The cause was argued before HAMMOND, C. J., and MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Herbert Burgunder, Jr.,* with whom was *F. Gray Goudy* on the brief, for appellants.

*Phillips L. Goldsborough, III* and *Theodore B. Cornblatt,* with whom were *Smith, Somerville & Case* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The O'Dohertys owned a three-story frame house of *fin de siècle* vintage in the Baltimore suburb of Catonsville. In November 1966 the appellee was summoned to unstop a bathtub drain. After earlier false starts Smith and Lincoln, employees of the appellee, turned up at 8:00 a.m. on Saturday, 26 November, to deal once more

with the problem. They gained access to the drain by removing a panel in the wall of an adjoining bedroom, known as "Grandma's room." Using a flashlight they could see the tub resting between two heavy (4" x 8") timbers. By getting down on his "hands and knees with * * * [his] head almost in the hole" Lincoln could see about "half-way back" under the tub. Between the bottom of the tub and the first floor ceiling beneath it there lay scattered about the familiar collection of rubbish which Lincoln described as "broken up plaster and tile." They began their investigation by releasing a lock nut at the top of the trap. They collected in a flat pan the water that ran out of the trap from the tub. In order to get their electric cable (a sort of roto rooter) into the "waste line" it became necessary to remove the trap. To accomplish this a soldered joint in the two inch copper pipe had to be "unsweated." Heat was applied by using an acetylene gas torch which, it was said, generates temperatures in excess of 2000 degrees Fahrenheit. By way of comparison the ignition point of wood is between 400 and 500 degrees. After about two hours' work they located the stoppage and cleared it. To replace the trap it was necessary to use the torch again. After the joint was resoldered the access panel was replaced. They left the house around 1:00 p.m. Asked what safety equipment or safety measures were used during the job Lincoln replied, "Not anything."

Between 11:00 and 11:30 p.m. the 16 year old daughter watched a television program with her grandmother in "Grandma's room." She "thought her room was awfully smoky that night." It was "a different smell" from cigarette smoke. Four years later the grandmother declared she had a dream about smoke the night before the fire. On the following morning (Sunday) Mrs. O'Doherty complained of a smoky odor which she thought might be attributed to her husband's cigars. At about 11:00 a.m. the daughter saw smoke coming out of Grandma's room. The aroused family soon learned that the

house was burning. The alarm was sounded, the firefighters arrived and they spent the balance of the day extinguishing a stubborn and costly fire. The damaged structure eventually was turned over to the firemen who burned it as a part of their training program.

In due course Allstate Insurance Company settled with the O'Dohertys and thereafter initiated this action as subrogee. There seems to be no dispute, in the record before us, about the fact that there was no causal connection between the fire and a defect in any electrical appliance or in the wiring of the house. Neither does anyone claim that the heating system had anything to do with it.

After discovery procedures had been completed the case came on for trial on 17 November 1970 before Haile, J., and a jury, in the Circuit Court for Baltimore County. At the conclusion of the plaintiffs' case Judge Haile directed a verdict for the defendant, appellee here. Whether he was correct in so doing is the question before us.

Charles H. Winter, Jr. (Winter), testified on behalf of the appellants. He had been employed as a chemical engineer by the du Pont Company for about 30 years. He is a member of the American Chemical Society, the American Institute of Chemical Engineers, the *National Fire Protection Association* and the Association of Consulting Chemists and Chemical Engineers. He claims to be "co-author of a well-known book." He said he has "thirty some patents." He "deal[s] with fire all the time, controlled fires in furnaces for providing heat for the chemical reactions themselves." He has "worked on high temperature process flame-like reactions for burning materials * * *." "Fire and chemical, firelike chemical reactions * * * [have] been a way of life for * * * [him] for many years." Now retired from du Pont and self-employed as a consultant he has a number of corporate clients including insurance companies for some of which he investigates accidents. He never saw the O'Doherty

house because "it was no longer in existence when [he] was first brought into the case, after an earlier expert had died * * *." He has examined all of the evidence in the case and he was present during the entire trial. Appellee does not suggest that he lacked the qualifications to testify as an expert witness.

Winter testified that, in his opinion, "the fire was the result of the activities of the workmen" on Saturday, 26 November. Indeed, he considered it "an overwhelming probability." He went on to say, in part:

> " * * * All the evidence I have seen and heard seems, rather, overwhelming to me that the fire did start in some sort of small smoldering incipient fashion beyond description under that tub, *perhaps, blown there, a piece of burning debris blown there by the force of the gas from the torch as it does with considerable speed and velocity, so a fire could have been started far beyond the visible portion of the torch.* You have hot gases far beyond the visible portion of the torch if it were held within a half inch. The flame would be decreased if the flame were held three inches, the flame would be decreased and you would have hot whiffs of gas moving out in all directions and it would start fires beyond all visible portions of the tub. * * * [S]omething burning could have been blown back under the tub where it could not be seen a short distance or a considerable distance and on the outset, this would not be visible. I think they had neither a mirror or a periscope to see the area I am referring to. I don't see how anyone could testify as to whether or not there was debris there. It could not be seen without special equipment. * * * There is a hollow space in the ceiling and movement of air has to be in there. This is in the winter time and the house was under heat, so that air is going to be moving

out every place it can go out, up high spaces, for example, the louvers up on top of the roof area in the right sketch."

\* \* \*

" \* \* \* *This is a piercing, spearing jet of hot gas and, as it ignites, the volume, as it swells from the heat,* the gas and the air that mixes is mixed with it in the torch and will swell five or six fold in volume, so that will further increase with the volume, so it ends up with a general blowing of a piece of material burning or otherwise some distance."

\* \* \*

"Well, the hottest part, the acetylene air flame —the temperature is *several thousand degrees,* in the order of *four thousand degrees Fahrenheit,* far above the ignition point of wood, which is in the order of *four or five hundred degrees Fahrenheit."*

\* \* \*

"I mentioned that it has the capability of igniting something beyond the end of the flame because at the end of the visible flame, the temperatures are down to about several, say two thousand degrees Fahrenheit, beyond that and, is invisible. There is hot gas which is capable of igniting some finely, divided material like sawdust or wood shavings all the way down to where the temperature, roughly, four or five hundred degrees Fahrenheit and the four or five hundred degrees gas is not visible. That is a temperature of an oven you use for a roast, you know. There is no visible redness or flame. In addition, to complete the answer to the question, *the flame could ignite something close to it* in the visible portion of the flame or near the visible portion, *just beyond the visible portion of the flame, and continue to blow back physically*

*by force of the gas some distance beyond the point where it is originally ignited,* as I mentioned, in the case of the wind blowing a leaf off a pile of burning leaves some distance."

\* \* \*

"I mentioned two of them that would merely indicate that the burning material could have been dropped to start a smoldering fire at some considerable distance from the visible portion of the flame or the part of the building that could be observed by the workmen." (Emphases added.)

Asked "what precautions, if any, [the] workmen [should] have taken," Winter replied:

"In an area which cannot be properly inspected, first, they should approach the tub recognizing the hazards of dealing with a flame source up into an area which cannot be inspected, containing unknown, potentially, combustible material under the tub. Perhaps, the most standard way this is done in my experience is to—welders, cutters, plumbers, people who use torches, *they carry two things.* They carry *fire extinguishers.* They also carry *asbestos blankets* that can be used to protect nearby combustible material. Cleaning the areas as much as possible would be highly desirable. Removal by reaching in with a whisk broom or dust brush and getting out everything that could possibly ignite would be certainly proper and an audit of the hazards to be taken before the work was started. Following that work, before the access panel was replaced, a thorough inspection would be required. This is difficult in this job. It could have been done with a lady's hand mirror looking for a glow up in the dark there. It could be done by an attempt to smell.

That one would be difficult because air is probably moving in the other direction, but, perhaps as a final measure, the area under the tub, the blind area, could be thoroughly covered by carbon dioxide from a small fire extinguisher. *If you can't be certain, you may or may not have started a fire, you pretend there is one there and put it out, flood the area with a carbon dioxide extinguisher."* (Emphasis added.)

In respect of the time lag between the departure of the workmen and the discovery of the fire, he said:

"You are asking is it possible for a fire to remain in an unignited, incipient, dormant, smoldering state for this period of time? Remember, this violates no law of nature. I am sure you have read and heard of coal mine fires that smolder for twenty years before they break out or waste piles that smolder for years or dumps that smolder and burn. *I have a personal experience in a fire at my own property where there was a twelve hour delay.* This violates no law of nature. The set example is a cigarette left on an ash tray and it will burn at a rate depending on a lot of things. It burns at a surprising slow rate, something like a foot an hour, if you can think of a cigarette longer than a foot, at a surprising slow rate, something like a foot an hour, and I am aware of other cases." (Emphasis added.)

Put to him in cross-examination was a statement he made in a pretrial deposition. The question and answer follow:

"Q. (Mr. Goldsborough) Mr. Winter, you testified, then, in your deposition that it was pure speculation and not your opinion as to what the plumbers did which resulted in the fire starting, is that still your testimony?"

\* \* \*

"A. The details of exactly how it was done is speculation. I said I saw, if you refer to my deposition, I saw *overwhelming evidence there was a one to one relationship between the activities of the plumber and the fire that started the next day.* Now, just—I have to *speculate on exactly what they did* and that's where I was speculating about. Also, there is a very fine line between speculation and opinion. In these areas, you have to reconstruct something that happened several years ago.

"Q. Do you feel there is a fine line, also, between speculation and overwhelming probability? A. Overwhelming probability referred to what the activities of the plumber and the area of speculation *refers to the details of exactly what activity was involved.*"

\* \* \*

"A. I referred to the ability of the torch to throw small bits of burning material to start fires with hot gases which cooled up to the point they are no longer visible. They are still hot, four or five hundred degrees Fahrenheit, and are capable of starting a fire with wood chips.

"Q. You think this could have resulted from some hot gases beyond the end of the flame of the torch, is that what you are saying? A. Yes, coupled with *some physical transport of a small piece of, a small material, a spark. I work with torches and I have seen these sparks.*" (Emphases added.)

We shall repeat once more what must now be old hat, i.e., in cases like this we must consider the evidence and all inferences logically and reasonably deducible therefrom in a light most favorable to the appellants. *Trusty v. Wooden,* 251 Md. 294, 297 (1968), and the cases therein cited.

Judge Haile saw great significance in the absence of

proof of a flame on Saturday morning caused by either a "cigarette butt or a flying spark." He emphasizes that this was not a welding operation such as the one considered in *Proctor Electric Co. v. Zink,* 217 Md. 22 (1958), where sparks from a welding operation set fire to bolts of cloth five to eight feet away. He was impressed also by the fact that wooden supports under the center of the tub seemed not to have been damaged, although there was heavy charring less than 12 inches from that point.

We do not think Judge Haile viewed all of the evidence (and the inferences) in a light most favorable to the appellants. On the contrary he seems to have strained here and there to give the appellee the better of it. It strikes us that Lincoln and his confrère embarked upon a project that was fraught with risk. It stands admitted that neither of them could see more than "half-way back" under the tub yet they introduced into this confined area a torch generating temperatures ranging from 2000 to 4000 degrees Fahrenheit. They had to apply the torch to the two-inch copper pipe long enough (at least several minutes) to raise the pipe to a temperature hot enough to allow the solder to melt. The operation was repeated shortly before they packed up and left. Not only was their vision limited but the back side of the trap and the connecting pipes were as invisible to them as the dark side of the moon is to all but astronauts in flight behind it. No safety measures were adopted by them either before or after. In the circumstances Winter's testimony seems to us to be simply a technical elaboration of what the natural and immediate reaction of the average householder would be. We think it can logically and reasonably be inferred from the evidence, viewed in a light most favorable to the appellants, that a small piece of material (a chip of wood, a small pebble, a sliver of tile, a lump of plaster) was heated to incandescence and blown into a joint or crevice in the wooden structure and, fed by the nesting wood and the rising air, propagated until the ignition point of the wood was reached.

The appellee makes a strong effort to denigrate Winter's testimony because of his ingenuous use of the word "speculation." We have taken note of the fact that this was Winter's first appearance in court as an expert witness and we think it is clear that he intended by his use of that word to connote something more than a mere guess. Moreover he said his "speculation" was confined to the "details of exactly what activity was involved." Indeed there was no need for speculation about what, in general, the plumbers did; Lincoln testified as to that. But Winter went on to say that he saw "overwhelming evidence" that there was a "one to one relationship between the activities of the plumbers and the fire that started the next day." We think the evidence provides an adequate basis for his opinion.

The mere showing that the appellants' loss may have been caused by the appellee's negligence is, of course, insufficient. *Vroom v. Arundel Gas Co.,* 262 Md. 657 (1971). But we think Winter's expert opinion, thus far uncontradicted, lifts the issue of negligence from mere possibility to a rather strong probability. To date there is but one explanation for the fire, there has been an admission that none of the safety precautions suggested by Winter were taken and, as we have said, there is uncontradicted expert testimony that Smith and Lincoln were negligent, and that their negligence caused the fire. We think, on this record, reasoning minds rationally could find that they breached the requisite duty of care and that their breach was the cause of the fire.

It must not be supposed that we are suggesting the appellants' case is bullet-proof. We hold only that on this record they have established a prima facie case and that the burden of going forward with the evidence thereupon shifted to the appellee. The appellee may have some heavy shot in its locker and, when the case is tried again, it may be able to present affirmatively, uncontradicted, uncontroverted and inherently probable facts making untenable the inferences we think the appellants presently

are entitled to rely upon. *Arshack v. Carl M. Freeman Associates, Inc.,* 260 Md. 269 (1971), and the cases therein cited.

> *Judgment reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by appellee.*