## VROOM *v.* ARUNDEL GAS COMPANY

[No. 476, September Term, 1970.]

*Decided June 29, 1971.*

658

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Andrew E. Greenwald,* with whom were *Karl G. Feissner, William L. Kaplan, Thomas P. Smith, Fred R. Joseph, Walter E. Laake, Jr.* and *Feissner, Kaplan & Smith* on the brief, for appellant.

*C. Edward Hartman, II,* with whom was *Stanley E. Hartman* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

This case well could be a nightmare for dentists and other advocates of regular oral hygiene. The unfortunate plaintiff-appellant, Miss Vroom, in the process of cleaning her teeth before retiring, rinsed her mouth with water from the spigot in her bathroom and immediately experienced a burning and stinging of her lips, tongue and mouth. Prior to this occurrence she had had no problems with the skin of her mouth or her tongue or mucous membranes, but after the acute phase subsided she since has experienced excessive dryness continually inside her lips and mouth and a loss of taste on the tip of her tongue.

Arundel Gas Company, Inc., the defendant-appellee, earlier had installed water conditioning equipment in Miss Vroom's well. Under the contract Arundel alone was to service the mechanical parts of the conditioner and

at regular intervals place in the equipment the proper chemicals in correct combinations and amounts to be pumped into the water supply so as to, among other things, maintain a proper balance between acidity and alkalinity. Some eighteen months after the original installation, the water came into the house green-blue in color and waxy and greasy. Arundel made a number of service calls but the water remained unsatisfactory and Miss Vroom, who was director of nurses for the Prince George's County Health Department, brought home from her place of employment water in glass jars to use for making coffee, cooking and drinking. It was about ten-thirty in the evening of March 6, 1969 that Miss Vroom rinsed her mouth with the well water that had passed through Arundel's conditioner, and was burned. She sued Arundel for breach of warranty and negligence. Judge Melvin sent the warranty count to the jury, which found for Arundel, and directed a verdict for Arundel on the negligence count. The appeal is from the judgment that followed the direction of the verdict.

Arundel supports Judge Melvin's ruling by saying there was no evidence of any wrongful act or omission by it that was a proximate cause of Miss Vroom's injury and, if there was, the court properly struck her testimony as to the present condition of her mouth and lips because it was unsupported by competent medical evidence. Miss Vroom says not so, the diametrical opposite is what is presented to the Court by the record. We think Miss Vroom has the better of the argument.

In considering whether the verdict rightly was directed against Miss Vroom, we must consider the evidence in a light most favorable to her, resolving all conflicts in her favor and assuming the validity of all inferences which naturally and legitimately may be drawn from such evidence. A verdict for a defendant must not be granted if there is any legally relevant and competent evidence from which a rational mind can infer a fact at issue. *Yommer v. McKenzie*, 255 Md. 220, 228.

Miss Vroom proved the rinsing of her mouth, the burning and stinging of her lips, mouth and tongue that followed, and the dryness and loss of taste that have persisted since. She asked a Mr. Karpen, a co-worker, to look at her face and mouth the morning after the incident. He testified that at that time he observed the area around her mouth "to be quite red and slightly swollen." The same day a doctor, Donald Childs, took a "professional look" at her mouth and face and said:

"The inside of her mouth, particularly inside the lower lip, showed redness and vesiculation which is a small blister-like formation. There was also papillary formation, meaning a small bumpy appearance of the * * * appearance was that of small cold sores that you are probably familiar with. It was that type of lesion, that type of irritation that was lining the lower lip. In addition to the inside of the mouth, her lips and face around the mouth had a definite appearance of swelling and some redness or erythema * * * was rather scaley and dry at that time."

To prove that Arundel had been negligent and that its negligence was the proximate cause of her injuries, Miss Vroom produced, besides herself, two witnesses. One was her co-worker, Mr. Karpen, who holds a Bachelor's degree in chemical engineering and a Master's degree in sanitary engineering. He ran a PH test for Miss Vroom on the water that affected her mouth. PH is a measurement scale of the acidity and alkalinity of water, running from zero to fourteen. Seven is neutral, and the higher the scale tests out from seven to fourteen, the higher the alkalinity of the water. The increase is not simply arithmetical but rises geometrically by powers of ten, so that a water solution with a PH reading of 11 would have 10,000 times the alkaline presence of a solution with a PH reading of 7.1. Mr. Karpen's test equipment

could read no higher than 10.2 and this is what the sample of water Miss Vroom gave him made it read. This, he said, showed the water was caustic and that the effect would be like that resulting from "putting your hand into a lye solution * * * it would have the same effect, burning effect." Judge Melvin later struck the quoted testimony but we think the witness was qualified to give it and that it was error to strike it. Mr. Karpen later testified that caustic soda "[d]epending on the concentration * * * could have a very high PH." This too was later stricken, again erroneously. Both opinions were cumulative since Mr. Karpen testified without objection that the water he tested had the "slippery feeling" water has "when you dissolve household lye [caustic soda] in it."

The second witness, Mr. Hurney, was also a chemical engineer who for thirty years had been in the business of the sale and installation of water-treating equipment and the analysis of water. He said he had in those years been "intimately connected with operations of waste water plants, and potable water plants and water treating equipment * * *." He was offered as "an expert on water chemistry" and no objection was made to his qualifications. He had twice examined Miss Vroom's well and the water treatment equipment that Arundel had installed and agreed to service for her. His tests showed that the water as it came from the well had a PH of four. When he tested the remains of the sample Mr. Karpen had tested on an "electrical PH meter which is accurate plus or minus to the second decimal point on the PH reading," he got a PH reading of 11.2. When asked what caused the PH to be so high, he replied that further analysis of the water showed there were 410 millimeters [milliliters] of sodium hydroxide in the water sample and that another name for sodium hydroxide is caustic soda. The 11.2 reading showed the tested water sample was "quite alkaline. High caustic." He said there would have been no change in alkalinity caused by

caustic soda between March 6, 1969 (the night of the burning of the mouth) and the time of his examination.

He testified further that the kind of chemicals put in the equipment would have an effect "as to whether there would be for instance any injury to the skin or mucous membranes." His opinion was that above a PH of 8.31 "there would be caustic soda ionized and dissolved in the solution to cause an effect on the skin." He explained that the pump that feeds the conditioning chemicals into the water that goes into the house is supposed to work intermittently, that is, to start and stop with the starting and stopping of the well pump so that a proper proportion of chemicals will be sent into a certain amount of water, and that in addition to the chemical pump the system includes an automatic water softener which is controlled by a small electric clock which requires constant electric current. The electrical plug for the water softener and that for the pumps were in the same "small outlet box"—and had no differentiating marks. He testified further:

> "The plug or cable-plug that was on the chemical feed pump was exactly the same as the one that would be on the water softener, so that if an operator, or person who services this equipment, wasn't careful he could plug the water softener into the elecric connection on the pressure switch and he could * * * connect the chemical feeder onto the constant hot line. * * *
>
> "That would be the only way, after I checked out all of this equipment, that this chemical feed pump could pump a tremendous amount of caustic soda or sodium hydroxide into this mixing tank to get the PH that high."

The service reports of Arundel showed its man had serviced the Vroom equipment on the sixth and seventh of March 1969. The report for the sixth showed a PH

reading of 5.5, that the service man "increased feed from 4.5 to 7.5" and put in "¾ gallon of SS 20" (liquid caustic soda). The report for the seventh indicates that on that day the service man found the chemical pump "plugged in on hot line." He unplugged it, drained out tank and lines, refilled them and turned the feed pump back from 7.5 to 4.5.

Mr. Hurney's opinion as an expert was that although there could be other possible causes, the only reason the PH of the water Miss Vroom used to rinse her mouth was excessively high on the evening of March 6 was because the electrical plugs were in the wrong outlets on March the sixth and excess caustic soda had been pumped into that water that day. He testified that in order to service the conditioning equipment as the reports of Arundel showed it had been serviced on March 6, the plugs had to be pulled and that in replacing them the feeder pump plug was mistakenly put in the constant "hot line" outlet.

In our view Miss Vroom offered evidence from which reasoning minds rationally could find that Arundel owed her the duty to maintain the water-conditioning equipment in proper and safe condition, that it carelessly violated this duty and that its negligence brought about the very high caustic content of the water that burned her mouth and caused the physical harm, the effects of which she continued to feel at the time of trial.

Judge Markell said for the Court in *Charlton Bros. Co. v. Garrettson,* 188 Md. 85, 94, that:

> "The law requires proof of probable, not merely possible, facts, including causal relations. Reasoning *post hoc, propter hoc* is a recognized logical fallacy, a *non sequitur.* But sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the absence of evidence of any other equally probable cause."

Messrs. Karpen and Hurney offered evidence that it was probable that Arundel had negligently caused the water that came from the bathroom spigot and into Miss Vroom's mouth to be filled with highly concentrated caustic soda and that caustic soda (or household lye) could harm the skin and mucous membranes. Miss Vroom testified that the water did burn her skin and mucous membranes and that she was well and sound orally up to the instant she put the water in her mouth and that she has not since been orally sound and well. No evidence of any other equally probable cause of the harm Miss Vroom suffered had been offered when Judge Melvin ruled.

It is not always necessary that the existence of physical injury and the source of its cause be proved by expert medical testimony. "Particularly is this true when the disability develops coincidentally with, or within a reasonable time after, the negligent act, or where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen." *Wilhelm v. State Traffic Comm.*, 230 Md. 91, 99; *Straughan v. Tsouvalos*, 246 Md. 242, 257-258. See also *Deremer v. Liston*, 252 Md. 571, 577-578. We think this is a case where the exception is applicable. Miss Vroom was entitled to have a jury consider her account of the harms she suffered on March 6 and her subsequent harms.

> *Judgment reversed, with costs, and case remanded for a new trial.*