# WILLIS *v.* CURRY

[No. 270, September Term, 1971.]

*Decided April 4, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SMITH, JJ.

*L. Robert Evans,* with whom was *Walter Litvinuck* on the brief, for appellant.

*Edward C. Mackie,* with whom were *Nathan Stern* and *Raymond M. Faby* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

On Sunday, 16 June 1968, the appellee (Mrs. Curry), her six children, Henry DiStefano and his son (Junior) set out for Denton to go fishing in the upper reaches of the Choptank River. Along the way she became a casualty. Three years later a Queen Anne's County jury awarded her $15,752.75, a verdict the trial judge, Turner, J., refused to disturb. From the ensuing judgment the appellant (Willis) has appealed, assigning as errors Judge Turner's refusal to direct a verdict in his favor, his denial of a request for an instruction, and the admission of certain testimony. In our appraisal of the propriety of Judge Turner's submission of the case to the jury we must consider the evidence in a light most favorable to Mrs. Curry for, as we have often said, it is only where there is neither evidence of negligence nor evidence from which negligence can legally be inferred that the direction of a verdict for the defendant can be sustained. *Katz v. Holsinger,* 264 Md. 307, 311 (1972) ; *Critzer v. Shegogue,* 236 Md. 411, 415 (1964).

In June 1968 Mrs. Curry was a 35 year old widow whose first marriage had ended in divorce. Paul Tenney, 14, and the 13 year old twins, Melvin and Michael, were the issue of her first marriage. Charles Curry, 11, and 10 year old twins Geraldine and Patricia were fathered by her recently departed (May 1968) second husband. DiStefano, a friend, had proposed the fishing trip. She agreed and on Sunday morning he came by in his 1962

Chevrolet pickup truck and took them all aboard. They went first to his house in Lansdowne. After a few beers they got their fishing tackle together and headed for Denton. Junior, in Vietnam at the time of trial, was behind the wheel. In the cab with him were the twin girls. Mrs. Curry and DiStefano were in the back of the truck sitting "in lounge chairs." The four boys sat on the "toolbox next to the cab."

After crossing the Bay Bridge DiStefano looked through the window in the back of the cab and saw that they were "running low on gasoline." He "knocked on the window" and shouted to Junior "to stop at the next station and fill it." The next station proved to be Willis's "Shell" station at Grasonville. During the filling operation gasoline vapor ignited inflicting upon Mrs. Curry painful second degree burns about her face, neck, arms and hands.

That there was a fire seems to have been the only thing about which the witnesses could agree. In our recital of the facts we shall point out, from time to time, some of the many conflicts in the testimony.

Willis said he was sitting at his desk eating a sandwich. At about 1:40 p.m. DiStefano's truck "pulled up to the gas island." He told William Davis (Davis), 62, who was helping him, to "catch that customer" while he finished his lunch. Davis turned on the pump and began "putting gas in the truck." Willis continued:

> "* * * A lady got out of the back of the truck walked around like she was going to walk to the front of the truck and changed her mind and walked back and leaned in the window of the truck. There was an explosion and I grabbed a fire extinguisher and ran out as fast as I could to put the flames out. In a second she run away which I was more interested in the children and the truck and also I got them flames out quickly.
>
> "A gentleman moved the truck away, which

it was a fire burning under the truck, which I put out."

It will be observed that Willis said Mrs. Curry "got out of the *back* of the truck." She said she "went over *the [left rear] fender*," walked to the left window of the cab and asked the girls to find her purse and hand it to her. While she was standing there Davis arrived, "put the nozzle in the tank and started pumping gas." She said she was "trying to get the purse open and all at once the fire come alongside of * * * [her] and * * * [she] was in flames." DiStefano said "she *didn't get out* of the truck to go to the window, she *leaned forward* to the window." After she was "on fire she jumped out of the back of the truck." He said this happened "a minute or a minute and a half; two minutes" after Davis had begun to pump gas. There was testimony that, after the fire had been extinguished, the meter showed $3.85. (All emphases added.)

Willis and five other witnesses testified that Davis did not smoke, did not drink, and had never married. One witness, however, volunteered the information that "he [Davis] liked the girls * * *." On the other hand Paul Tenney said Davis was smoking a cigarette as he walked out to the gas pump. Asked what Davis did with the lighted cigarette he said he "set it on the pump he was getting the gasoline from." He went on to say that the hose from the pump to the nozzle "was leaking" and that "there was a rag tied around it." He told Davis "the hose was leaking but he [Davis] said he knew it already." The fire, he said, started "just all of a sudden." Davis "pulled the hose out and started squirting * * * [Mrs. Curry] with it." He thought all this happened about five minutes, "maybe a little longer," after Davis arrived at the pump. Patricia testified that Davis "laid his cigarette on the * * * gas thing where the gas was" and that she heard Melvin say to Davis, "Your ashes are falling." Asked how the ashes could fall, she said the cigarette "was on the edge * * * hanging over."

Willis said that Mrs. Curry had a cigarette in her

hand when she got out of the truck. He did not "know whether it was lit or not." He did not see her "smoke on it." Davis said he heard Mrs. Curry "ask the boy [Junior] for a match." Paul testified everybody was out of cigarettes before they "got to the gas station." Davis said he "didn't see anyone smoking." Willis said that after he put out the fire he saw a cigarette still smouldering on the ground "about two-thirds burnt." As to whether it had been smoked by Mrs. Curry or Davis he did not say. Davis also saw a cigarette butt.

We found in the transcript photographs of a pickup truck which, it is agreed, is the same as DiStefano's truck. It is quite clear that the opening to the pipe leading to the gasoline tank is a few inches above and about three inches to the rear of the handle of the left door and only slightly below the window. The distance from the ground to the filler pipe opening appears to be about 43 inches. The pump and meter housing appears to be about 50 inches high. There was testimony that the distance between the housing and the filler pipe opening at the time of the fire was about 30 inches. If Mrs. Curry had been standing on the ground, as she said, by the left door of the truck talking to Geraldine, the filler pipe opening would have been about a foot or so from her right arm. If, as DiStefano said, she had been standing in the rear of the truck leaning into the left window, then the filler pipe opening would have been a few inches below her torso.

Willis produced Dr. Wilbert J. Huff as an expert witness. He described himself as a chemist specializing in the combustion of dust, gases and solid fuels. It seemed to us that his qualifications were far more impressive than his testimony. He heard the testimony of all of the witnesses but it is not at all clear what, if any, pretrial investigation he made. He said that in his opinion the lighted cigarette on top of the pump housing, assuming one was there, was *not likely* to have caused the fire. What follows is an excerpt from his testimony:

"Q. * * * [W]hat * * * led you to believe

that the cigarette on top of the pump could not have caused this explosion? A. Because I don't think there would be enough gasoline coming up through there. After all, the gasoline coming up there is only the saturated vapor, it's very slowly being displaced by the filling of the tank and to have that large area of a combustible proposition, and ignitable proposition at that time, *I just don't believe is possible.*" (Emphasis added.)

Dr. Huff thought that in this "mysterious" case a discharge of static electricity might have ignited the vapor. What follows is another excerpt from his testimony:

"* * * I am inclined here to believe that of all of these things either there was something about the lighted cigarette of the lady that I don't know, if that could bring up an ignition situation or there was a static one. *Now, the jury is the person to decide whether I am right or whether I portrayed this thing correctly or not.* That's my opinion and I might say that since I am 81 years old and I got in this thing, you might say in Princeton University in 1917 that is a long period." (Emphasis added.)

We shall consider Willis's arguments in inverse order. He says it was error to admit Paul's testimony about the "leaking hose." Despite his taking "every conceivable step to assure himself of the allegations of negligence," he insists this testimony came as a complete surprise and that it was "grossly unfair" to allow the trial to proceed without giving him "a chance to procure evidence that no such condition existed." In this regard we might point out that he did not then move for a continuance, or for a postponement, or for a recess during which such evidence might have been procured. And, as Judge Turner pointed out, he had not bothered to take Paul's deposition although he was listed as a witness in Mrs.

Curry's answer to an interrogatory. Indeed we must view with some skepticism Willis's averment that he took "every conceivable step" to develop the facts since it does not appear that the depositions of Mrs. Curry or of any of the named witnesses were ever taken. Moreover we do not find in the interrogatories any query in respect of the source of the gasoline vapor nor any response stating what the source might have been; indeed, it was neither claimed nor shown that Mrs. Curry knew anything about a "leaking hose." There can be no doubt the vapor was there but whether it came from the filler pipe or from some undetermined amount that leaked from the hose to the pavement, or from both sources, seems to us to matter but little. The negligent act asserted by Mrs. Curry was the placing of a lighted cigarette on the edge of the pump. Even if Willis is correct, that there was no such leak, there was, nevertheless, enough credible evidence to enable the jury to find that the vapor being displaced by the liquid gasoline flowing into the tank and thereupon being mixed with the oxygen in the atmosphere was sufficient in volume and extent to be susceptible to ignition by the cigarette. It is true, of course, that Dr. Huff pooh-poohed the possibility but, as he himself acknowledged, the jury was at liberty to disregard his opinion. We doubt that Judge Turner fell into error by admitting the evidence but, if he did, we are satisfied the error was harmless.

The next assignment of error has to do with Judge Turner's rejection of "Prayer No. 14," the text of which follows:

> "The Court instructs the jury that if they find that the fire was caused by a discharge of static electricity from Mrs. Curry's body, then they must find that the Defendant was not negligent and their verdict must be for the Defendant, William Willis."

When the charge to the jury had been concluded counsel excepted to the omission from the charge of "Prayer No.

14." Judge Turner said he would not give an instruction on static electricity but that counsel might argue the point to the jury. We shall not acknowledge error on the part of Judge Turner because we think his instructions are quite adequate in this regard. It will be recalled that Dr. Huff thought the fire was caused either by Mrs. Curry's cigarette or a spark caused by a discharge of static electricity. The pertinent part of the charge follows:

> "Now, this testimony [Dr. Huff's] should be considered and weighed by you like any other evidence in the case and given the weight to which you deem the opinion to be entitled. In other words it is up to you to give the weight to Dr. Huff's testimony which you think it deserves in view of the facts which you have heard and the manner in which he testified as to what he heard and how he related it to the injuries. Now you may reject the opinion if the facts upon which it is based have not been established to your satisfaction by the evidence or if you're not satisfied with the reasons he gave in support of the opinion. You should take the testimony of this expert witness and evaluate it in the light of the facts upon which it is predicated, which you believe to have been proven by a preponderance of the evidence, and the competence of the person, that is Dr. Huff, to evaluate that basis and express an opinion based on such an evaluation."

We can safely assume that counsel pressed the static electricity argument to the hilt. In the circumstances we find it hard to understand how the exclusion of Prayer No. 14 from the charge could have inhibited or attenuated counsel's submission to the jury.

We turn now to Willis's first assignment of error, i.e., Judge Turner's refusal to direct a verdict in his favor. He makes much of the fact that Mrs. Curry did not pro-

duce an expert witness to say what caused the fire. He insists that no causal relation has been shown and that her reasoning is merely *post hoc, ergo propter hoc,* citing *O'Doherty v. Catonsville Plumbing & Heating Co.,* 262 Md. 646 (1971) ; *Vroom v. Arundel Gas Co.,* 262 Md. 657 (1971) ; *Arshack v. Carl M. Freeman Assoc., Inc.,* 260 Md. 269 (1971) ; and *Wilhelm v. State of Maryland Traffic Safety Comm'n,* 230 Md. 91 (1962), not one of which seems to support Willis's argument. Since it is surely common knowledge that gasoline is highly volatile and that any mixture of gasoline vapor and air is likely to be explosively combustible, one scarcely needs the opinion of an expert to conclude that a lighted cigarette in close proximity to such a mixture might well be the probable cause of an ensuing explosion. That is what Mrs. Curry alleged and her proof, if believed, supports it. The jury could have believed it and quite obviously they did. We could go on with an extended discussion of Dr. Huff's theories but, even granting them plausibility, if not persuasiveness, we would simply be flogging a dead horse. We think Judge Turner had no choice but to put the case in the hands of the jury.

> *Judgment affirmed.*
> *Costs to be paid by the appellant.*