681 A.2d 546

Wallace Newton EDMONDS, et al.

v.

CYTOLOGY SERVICES OF MARYLAND, INC., et al.

No. 1619, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Aug. 29, 1996.

Certiorari Granted Dec. 23, 1996.

---

Terrell N. Roberts, III (Roberts & Wood, on the brief), Riverdale, for Appellants.

Edward A. Gonsalves (Gary A. Godard and Godard, West & Adelman, P.C., on the brief, for appellees Jaffurs and Cytology Services), Fairfax, VA, Larry A. Ceppos (Andrew J. Marter and Armstrong, Donohue & Ceppos, Chartered, on the brief, for appellees Rivera and Mattei), Rockville, for Appellees.

Argued before MOYLAN, HOLLANDER and EYLER, JJ.

HOLLANDER, Judge.

This appeal requires us to interpret Maryland Code (1974, 1995 Repl.Vol.), § 5–109(a) of the Courts and Judicial Proceedings Article ("C.J."), which sets forth the statute of limitations governing actions against health care providers.

Debra Ann Edmonds succumbed to cancer in 1990, following an alleged misdiagnosis in 1983. In 1993, Wallace Newton Edmonds and Amanda Bree Edmonds (the husband and daughter of Ms. Edmonds), and the Estate of Debra Edmonds, all appellants, filed wrongful death and survival claims against Dr. William Jaffurs, Cytology Services of Maryland, Inc. ("Cytology"), Dr. Myrna Rivera, and Ivan Mattei, M.D., P.A., appellees, alleging that, in 1983, appellees had negligently failed to diagnose Ms. Edmonds's cervical cancer. When the matter proceeded to court, appellees moved for summary judgment, contending that appellants' claims were barred by limitations under C.J. § 5–109(a). The Circuit Court for Prince George's County granted the motion as to all claims. Appellants now present two questions for our consideration:

I. Did the lower court err by granting summary judgment against Wallace Newton Edmonds and Amanda Bree Edmonds on the grounds that their wrongful death claims were barred by the applicable statute of limitations?

II. Did the lower court err by granting summary judgment against the Estate of Debra Edmonds on the grounds that the survival claim was barred by the applicable statute of limitations?

For the reasons stated below, we conclude that the court erred in granting summary judgment. Accordingly, we shall vacate the judgment and remand the case for further proceedings.

### FACTUAL SUMMARY

In 1980, Debra Edmonds, who was then twenty-four years old and the mother of a young child, came under the care of Dr. Joseph Murgalo, a gynecologist who is not a party to this litigation. While under Dr. Murgalo's care, Ms. Edmonds experienced vaginal bleeding, abnormal discharge, and cervical eversion [1] and erosion. On February 19, 1981, Dr. Murgalo

---

1. "Eversion" is defined as a "turning outward." STEDMAN's MEDICAL DICTIONARY 545 (25th ed. 1990). Cervical eversion occurs when cells

performed a cryoconization of Ms. Edmonds's cervix.[2]

Ms. Edmonds continued to experience problems associated with cervical eversion. In September 1981 and April 1982, she had abnormal Pap smears.[3] In October 1982, Dr. Murgalo noted that the cervix needed attention.

On July 15, 1983, Dr. Murgalo performed a biopsy on a portion of white epithelium of the cervix.[4] The biopsy specimen was sent to Cytology, where Dr. Jaffurs, a Cytology employee, examined it. Dr. Jaffurs diagnosed "severe epithelial dysplasia—epidermoid carcinoma-in-situ (cervical intraepithelial neoplasia—3)."[5] In a "comment" on his written re-

---

that normally appear on the surface of the inner portion of the cervical canal begin to appear on the outer portion of the canal.

2. "Cryoconization" is the "[f]reezing of a cone of endocervical tissue with a cryoprobe." STEDMAN'S, *supra*, at 375. A "cryoprobe" is an instrument used in "cryosurgery"—that is, "[a]n operation using freezing temperature (achieved by liquid nitrogen or carbon dioxide) to destroy tissue." *Id.*

3. A "Pap smear test" is a "microscopic examination of cells exfoliated or scraped from a mucosal surface after staining with Papanicolaou's stain." STEDMAN'S, *supra*, at 1572. It is "used especially for detection of cancer of the uterine cervix." *Id.* The test is named after Dr. George N. Papanicolaou (1883–1962), a Greek-born physician, anatomist, and cytologist.

4. "Epithelium" is a general term for "[t]he purely cellular avascular layer covering all the free surfaces, cutaneous, mucous, and serous...." STEDMAN'S, *supra*, at 527.

5. "Dysplasia" means "[a]bnormal tissue development." STEDMAN'S, *supra*, at 479. "Epithelial dysplasia" signifies "nonmalignant disorders of differentiation of epithelial cells."

"Carcinoma in situ" of the cervix "has been classically defined as a microscopic pattern in which the full thickness of the cervical squamous epithelium is completely replaced by undifferentiated abnormal cells morphologically indistinguishable from cancer." Howard W. Jones, III, M.D., et al., NOVAK'S TEXTBOOK OF GYNECOLOGY 652 (11th ed. 1988). The "in situ" term means that the lesion is confined to the lining epithelium and has not spread to adjacent structures. *See* STEDMAN'S at 246.

"Neoplasia" is "[t]he pathologic process that results in the formation and growth of a neoplasm," *i.e.*, a tumor. STEDMAN'S at 1029, 1030. "Cervical intraepithelial neoplasia" (also known as "CIN") consists of

port, Dr. Jaffurs stated: "Patient should be considered for further diagnostic surgery."

On July 28, 1983, Dr. Murgalo ordered an additional biopsy of Ms. Edmonds's cervix. The specimen was examined by Dr. Rivera, an employee of the laboratory of Ivan R. Mattei, M.D., P.A.[6] Dr. Rivera diagnosed "foci of severe epithelial dysplasia—5." Shortly thereafter, Dr. Murgalo performed a cervical conization.[7] The specimen was sent to the pathology department of Prince George's Hospital and Medical Center. Dr. Abolghassem Hatef, a pathologist who is not a party to this litigation, examined the specimen and stated in a subsequent report: "Cervical cone showing two minute foci of severe dysplasia. All margins are free—5."

Following the cervical conization, Ms. Edmonds remained under Dr. Murgalo's care. Between the evaluation of the conization in 1983 and August 1988, Dr. Murgalo continued to follow Edmonds and took periodic Pap smears that were benign.[8] During this period, Ms. Edmonds apparently did not report any symptoms suggestive of cervical cancer, and she did not undergo any further diagnostic procedures.

---

"dysplastic changes beginning at the squamocolumnar junction in the uterine cervix which may be precursors of squamous cell carcinoma." *Id.* at 1029. There are three grades of CIN, which depend on how much thickness of the cervical epithelium is involved. Grade 1 is "mild," Grade 2 is "moderate," and Grade 3 is "severe dysplasia or carcinoma in situ." *Id.*

6. Appellants alleged that Dr. Rivera was acting within the scope of her employment with Dimensions Health Care Corporation and Prince George's County, and initially named these two entities as defendants in the statement of claim filed in the Health Claims Arbitration Office. Appellants voluntarily dismissed their claims against Dimensions and the County.

7. A "cervical conization" is a diagnostic procedure in which a cone of tissue is excised from the cervix. STEDMAN'S, *supra,* at 343; NOVAK'S TEXTBOOK OF GYNECOLOGY, *supra,* at 664–65.

8. At a deposition, Dr. Thomas F. Rocereto, one of appellants' experts, was asked to explain how the Pap smears could be benign if Ms. Edmonds had cervical cancer at that time. He responded:

In August 1988, Edmonds began to experience pain in her right sacroiliac and low back regions. X-rays taken at that time showed a "density" in the right mid-abdomen. That same month, Edmonds was admitted to the hospital for removal of her gallbladder. At that time, she complained of "continuous low back pain."

On May 1, 1989, Edmonds returned to Dr. Murgalo for an office visit, complaining of "severe pain" in the right buttocks, radiating down the right thigh. She also indicated that the pain had been "off and on for four months." [9] She saw Dr. Murgalo again on June 5, 1989 and complained of pain in the right sacroiliac area, radiating down to the groin and to the interior thigh. Dr. Murgalo referred her to an orthopedist. Despite the orthopedic care, Ms. Edmonds's back pain persisted.

On August 28, 1989, an electromyogram and nerve conduction study revealed "profound denervation of the adductors in the right leg consistent with a severe neuropathy involving the right obdurator nerve." [10] Ms. Edmonds continued to suffer excruciating pain in her right mid-lumbar spine and low back areas. She also began to lose a significant amount of weight.

Dr. Guy Gargour examined Ms. Edmonds on October 17, 1989 and performed a CT scan. He discovered a "mass" in

---

Obviously, there was nothing abnormal in that area of the cervix. Remember, when you do a PAP smear, you're only doing the surface.

 \* \* \* \* \* \*

So you can have a cancer that's growing underneath the cervix, you can have an obvious cancer growing underneath the cervix and do a normal PAP smear.

9. At his deposition, Dr. Rocereto stated that this pain was most likely "sciatic nerve irritation. And most likely at that time there was tumor already involved in the nerve root."

10. "Neuropathy" is a "classical term for any disorder affecting any segment of the nervous system," though in "contemporary usage" it refers to "a disease involving the cranial or spinal nerves." STEDMAN'S, *supra,* at 1048.

the right pelvic area. On November 5, 1989, Edmonds was admitted to Georgetown University Hospital for a cancer evaluation. She was diagnosed on November 8, 1989 as having "squamous cell cancer of unknown origin." [11] She began to receive chemotherapy and radiation treatment. After twenty-five days in the hospital, Edmonds was discharged. She returned to the hospital for cancer treatment on an outpatient basis.

On April 5, 1990, Edmonds was re-admitted to the hospital with symptoms of jaundice, anorexia, nausea, and vomiting. She died on April 11, 1990, at the age of thirty-four.

On April 9, 1993, Wallace and Amanda Edmonds filed a statement of claim in the Health Claims Arbitration Office.[12] The claim included both wrongful death and survival actions. They alleged that Dr. Jaffurs, Dr. Rivera, Cytology, and Ivan R. Mattei, M.D., P.A. were negligent. After the parties waived the jurisdiction of the Health Claims Arbitration Office, appellants filed a complaint in the circuit court on June 3, 1994.[13] They alleged that appellees (1) failed to diagnose "invasive cancer" in the cervical specimens that they had analyzed in 1983; (2) failed to advise Dr. Murgalo "of the need for surgical treatment to remove the tumor"; (3) failed "to obtain an adequate history" from Edmonds and Dr. Murgalo; and (4) failed "to consider the diagnosis of invasive cancer and discuss appropriate treatments."

---

11. "Squamous cell" is a general term denoting "a flat, scale-like epithelial cell." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 298 (27th ed. 1988). "Squamous cell carcinoma," in turn, is "carcinoma developed from squamous epithelium, and having cuboid cells." *Id.* at 272.

12. Under C.J. § 5–109(d), "the filing of a claim with the Health Claims Arbitration Office in accordance with § 3–2A–04 of this article shall be deemed the filing of an action" for purposes of the limitations periods prescribed by the section.

13. C.J. § 3–2A–06A(a) provides, in relevant part: "At any time before the hearing of a claim with the Health Claims Arbitration Office, the parties may agree mutually to waive arbitration."

Dr. Thomas F. Rocereto, one of appellants' experts, testified at deposition that Ms. Edmonds had "microscopic cervical cancer" at the time the original biopsies were taken in July 1983. He stated that, at that time, she had "at least ... Stage I" cervical cancer, meaning that "[t]he tumor, as far as I could tell from the record, was confined to the cervix." He added, however, that, with Stage I tumors, there is a "ten to fifteen percent chance" that the lymph nodes are also involved.

Dr. Rocereto also opined that, had Ms. Edmonds been correctly diagnosed, the standard of care for her treatment would have been a radical hysterectomy and lymph node dissection. Moreover, he said that, if she had been treated properly in 1983, she would have had at least a seventy-five to eighty-five percent probability of survival. Dr. Rocereto added that Ms. Edmonds's chances of survival could have been more than ninety percent if her cervical cancer were truly microscopic in 1983. He also testified that, by 1989, when Ms. Edmonds complained of severe pain, she had no chance of survival. He was unable to identify, however, the point in time when Ms. Edmonds's cancer became incurable.

Appellees disputed appellants' contentions and denied all liability. They asserted that the biopsy specimens were correctly analyzed in 1983. They also claimed that Ms. Edmonds did not die from cervical cancer. Appellees based this contention, in part, on the autopsy report from Georgetown University Hospital, which stated in its "History" section that "Primary cervical ... carcinoma[ ] had been previously excluded." The autopsy report also said, in its "Summary," that "the major part of the tumor appeared to be located within the pancreas," although the pathologist was unable to determine the origin of the cancer. Further, the Summary indicated that "[c]areful gross and microscopic examination did not reveal any other possible site [other than the pancreas] for primary carcinoma." [14] In addition, Dr. James F. Barter testified at a deposition that "there was no evidence that [Ms.

14. At his deposition, Dr. Rocereto questioned the pathologists' methodology, but could not say whether the autopsy report was mistaken.

Edmonds] had an invasive squamous cell carcinoma of the cervix."

Notwithstanding these factual disputes, appellees filed motions for summary judgment, asserting that appellants' claims were time-barred under C.J. § 5–109(a), which requires that an action be filed within three years of the date on which "the injury was discovered" (C.J. § 5–109(a)(2)), or within five years from the time "the injury was committed" (C.J. § 5–109(a)(1)), whichever is *shorter*. In their opposition, appellants contended that there was a genuine dispute of material fact as to when the five year limitations period in C.J. § 5–109(a)(1) had commenced; they argued that an "injury" within the meaning of that provision occurred only when Ms. Edmonds's cervical cancer metastasized to other parts of her body, and the medical experts were unable to state when that occurred. They also claimed that there was a factual dispute that precluded summary judgment with respect to the three year limitations period in C.J. § 5–109(a)(2), because "[t]here is absolutely no way that Debra Edmonds, as a person of ordinary prudence, would then suppose that it was necessary to re-examine the original tissue biopsies to be absolutely certain that they were correctly read." After a hearing, the court granted the motions, although the judge stated that he believed that the result was "extremely unfair."

We shall include additional facts in our discussion of the issues presented.

## STANDARD OF REVIEW

Maryland Rule 2–501 governs summary judgment motions. It is well settled that, in resolving a summary judgment motion, the court does not decide disputed facts. Rather, the court must determine whether there are disputes of material fact so as to make a trial on the merits necessary. *Maryland Casualty Co. v. Lorkovic*, 100 Md.App. 333, 353–54, 641 A.2d 924 (1994). "In order to defeat a motion for summary judgment, the opposing party must show with some particularity that there exists a genuine dispute as to a material fact."

*General Accident Insurance Co. v. Scott,* 107 Md.App. 603, 611–12, 669 A.2d 773, *cert. denied,* 342 Md. 115, 673 A.2d 707 (1996). A "material fact" is one whose resolution will somehow affect the outcome of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242, 603 A.2d 1357 (1992). In ruling upon the motion, the court must view the facts, including all reasonable inferences from those facts, in the light most favorable to the opposing party. *Baltimore Gas and Electric Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995). But, "[m]ere formal denials or general allegations of a dispute are not sufficient to establish" a material dispute. *Bagwell v. Peninsula Regional Medical Center,* 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *Bond v. NIBCO, Inc.,* 96 Md.App. 127, 135, 623 A.2d 731 (1993). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's claim is insufficient to preclude the grant of summary judgment." *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 738, 625 A.2d 1005 (1993).

In the absence of disputed facts, the court must determine whether a party is entitled to judgment as a matter of law. *Beatty, supra,* 330 Md. at 737, 625 A.2d 1005. Therefore, the ultimate standard for appellate review is whether the court was "legally correct." *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993); *Donovan v. Kirchner,* 100 Md.App. 409, 416, 641 A.2d 961, *cert. denied,* 336 Md. 299, 648 A.2d 202 (1994). Ordinarily, we will not affirm summary judgment on a ground upon which the trial court did not rely, if the court would have had discretion to deny summary judgment on the alternative ground. *Cheney v. Bell National Life Insurance Co.,* 315 Md. 761, 764, 556 A.2d 1135 (1989); *Warner v. German,* 100 Md.App. 512, 517, 642 A.2d 239 (1994).

## DISCUSSION

### A.

C.J. § 5–109(a), the statute of limitations in issue, states:

An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3–2A–01 of this article, shall be filed within the earlier of:

 (1) Five years of the time the injury was committed; or

 (2) Three years of the date the injury was discovered.

 Statutes of limitation are intended, in part, to ensure fairness by preventing "stale" claims. *Feldman v. Granger,* 255 Md. 288, 296–97, 257 A.2d 421 (1969). *See also McMahan v. Dorchester Fertilizer Co.,* 184 Md. 155, 159, 40 A.2d 313 (1944). Limitations periods rest on the notion that a defendant should not be called upon to defend against a claim when "evidence has been lost, memories have faded, and witnesses have disappeared." *Doughty v. Prettyman,* 219 Md. 83, 92–93, 148 A.2d 438 (1959) (quotation omitted). *Accord Bertonazzi v. Hillman,* 241 Md. 361, 367, 216 A.2d 723 (1966). While C.J. § 5–109 serves this policy, it was enacted to alleviate a special problem in the context of medical malpractice claims.

Prior to the enactment of C.J. § 5–109, medical malpractice claims were governed by the general statute of limitations in C.J. § 5–101. That section provides, in part, that "[a] civil action at law shall be filed within three years from the date it accrues...." Under this rule, a medical malpractice cause of action was deemed to "accrue" when the claim was discovered, i.e., at the time when the plaintiff either knew of his or her injury or, in the exercise of reasonable diligence, should have discovered it. *See Waldman v. Rohrbaugh,* 241 Md. 137, 139–45, 215 A.2d 825 (1966); *Hahn v. Claybrook,* 130 Md. 179, 182, 100 A. 83 (1917); *Lutheran Hospital of Maryland v. Levy,* 60 Md.App. 227, 232–33, 482 A.2d 23 (1984), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985); *Jones v. Sugar,* 18 Md.App. 99, 102–05, 305 A.2d 219 (1973).[15]

---

**15.** In 1981, the Court of Appeals extended the discovery rule to civil actions in general. *See Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981).

As the plaintiff's claim did not accrue until it was discovered, there could be a considerable time lag between the date when the physician rendered services and the date on which the cause of action accrued. Such time lags led to a phenomenon known as the "long tail effect" on medical malpractice insurance carriers. Because of the prospect that a physician's services could result in claims years after the service, insurance companies faced uncertainties in estimating their potential liabilities. The result was an increase in medical malpractice insurance rates.

In 1975, in the midst of a perceived crisis in medical malpractice insurance, the General Assembly enacted C.J. § 5–109. We have interpreted C.J. § 5–109(a)(2) to provide the plaintiff with three years from the date the wrong was discovered or reasonably should have been discovered. *See Russo v. Ascher,* 76 Md.App. 465, 469–73, 545 A.2d 714 (1988). Nevertheless, C.J. § 5–109(a)(1) serves as an outer limit on the time period in which the plaintiff may sue. It provides that an action may not be brought more than five years after "the *injury* was committed". (Emphasis supplied.) Moreover, this five year period runs irrespective of whether the injury was discovered or reasonably discoverable during that time. *Hill v. Fitzgerald,* 304 Md. 689, 700, 501 A.2d 27 (1985).

In *Hill,* the Court described the operation and purpose of C.J. § 5–109(a)(1):

[W]e think that the words of § 5–109 expressly place an absolute five-year period of limitation on the filing of medical malpractice claims calculated on the basis of when the injury was committed, *i.e.,* the date upon which the allegedly negligent act was first coupled with harm. The purpose of the statute, readily evident from its terms, was to contain the "long-tail" effect of the discovery rule in medical malpractice cases by restricting, in absolute terms, the amount of time which could lapse between the allegedly negligent treatment of a patient and the filing of a malpractice claim related to that treatment. The statute is a response to the

so-called crisis in the field of medical malpractice claims . . . and contains no room for any implied exceptions.

*Id.,* 304 Md. at 699–700, 501 A.2d 27 (citations omitted). Thus, "*Hill* indicates that the primary objective of the legislature was to promote society's interest in maintaining malpractice insurance coverage and managing the costs of malpractice litigation." *Newell v. Richards,* 323 Md. 717, 727–28, 594 A.2d 1152 (1991).

■ Appellants assert that the trial court erred in entering summary judgment, because there was a genuine dispute of fact as to when Ms. Edmonds suffered an "injury" within the meaning of C.J. § 5–109(a)(1). They claim that the trial court erroneously concluded, as a matter of law, that Ms. Edmonds suffered an injury in 1983, when appellees allegedly misdiagnosed the biopsy specimens. They point out that the decedent did not become ill until August 1988, when she began to experience back pain.[16] Because of this "lack of any discernible effect" on Ms. Edmonds, appellants argue that there was a factual dispute as to when appellees' negligence harmed or "injured" the decedent.

Appellants further contend that the word "injury" in C.J. § 5–109(a)(1) is ambiguous, and that interpreting it in the manner suggested by appellees would produce "absurd and unjust consequences"; Ms. Edmonds would have been required to file her lawsuit prior to July 1988, a time period in which she was in apparent good health and free from any signs or symptoms of cancer. Appellants assert that the General Assembly could not have intended such "unjust, oppressive or absurd consequences." Finally, appellants suggest that, if C.J. § 5–109(a)(1) required Ms. Edmonds to file her claim while she was in apparent good health, then it constitutes an unconstitutional denial of access to the courts, in violation of Article 19 of the Maryland Declaration of Rights.[17]

---

**16.** Dr. Rocereto opined at his deposition that this back pain was the result of gallbladder disease.

**17.** Based on our resolution of this case, we need not consider this issue.

In response, appellees vigorously contend that, if appellants' allegations are accepted as true, then Ms. Edmonds suffered an "injury" when appellees negligently failed to diagnose her cancer in 1983 or "certainly soon thereafter." Thus, they assert that appellants' claim is time-barred, because it was filed more than five years after the "injury was committed."

## B.

At the outset, we focus on appellants' contention that there is a factual dispute as to when Ms. Edmonds suffered an "injury." Appellants seemingly argue that Ms. Edmonds was injured when she experienced pain and other symptoms in 1988; they assert that "[t]he record is devoid of any evidence that after Dr. Murgalo performed the conization on August 1, 1983[she] had any signs or warnings of cancer, such as bleeding, loss of weight, change in appetite, nausea, pain, or discomfort."

We have found some authority, not cited by appellants, to support the position that an "injury" occurs when a person first experiences symptoms. The statute of limitations for medical malpractice actions in California is similar to Maryland's, *see* CAL.CIV.PROC.CODE § 340.5 (West 1982),[18] and the California courts have consistently interpreted the word "injury" to mean the "damaging effect" of the negligent act. *See Larcher v. Wanless,* 18 Cal.3d 646, 135 Cal.Rptr. 75, 80, n.11, 557 P.2d 507, 512 n. 11 (1976) ("[T]he word 'injury' . . . seems clearly to refer to the damaging effect of the alleged wrongful act and not to the act itself."); *Tresemer v. Barke,* 86 Cal. App.3d 656, 665, 150 Cal.Rptr. 384, 388–89 (1978) ("injury" is

---

**18.** Cal.Civ.Proc.Code § 340.5 provides, in relevant part:

In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after *the date of injury* or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for [fraud, intentional concealment, or the presence of an unauthorized foreign body in the patient].
(Emphasis supplied.)

"not synonymous with 'wrongful act,' but refers to the 'damaging effect' of the wrongful act"); *Wells Fargo Bank v. Superior Court for Sacramento County,* 74 Cal.App.3d 890, 896, 141 Cal.Rptr. 836, 838 (1977) (to the same effect). The California courts have also stated that a patient does not suffer an "injury" within the meaning of the statute until he or she has suffered "appreciable harm" as a result of the health care provider's act or omission. *Christ v. Lipsitz,* 99 Cal.App.3d 894, 897, 160 Cal.Rptr. 498, 500 (1979). *See also McNall v. Summers,* 25 Cal.App.4th 1300, 1307–13, 30 Cal.Rptr.2d 914, 917–20 (1994), *rev. denied,* (Sept. 7, 1994) (in case alleging negligent performance of electroconvulsive therapy that resulted in a stroke, "injury" occurred when patient noticed continuous memory loss).

But California's "appreciable harm" or "damaging effect" interpretation could result in a time lag between the date of the wrongful act and the date on which the limitations period would commence. In *Larcher v. Wanless,* 18 Cal.3d 646, 135 Cal.Rptr. 75, 557 P.2d 507, the California Supreme Court held that, in a wrongful death action, the word "injury" in the statute referred to the death of the patient, and not the patient's earlier illness. The court recognized that such an interpretation would not eliminate the "long tail effect" on medical malpractice insurers. It stated:

Defendants seem to argue from the premise that the undiluted purpose of section 340.5 was to lower malpractice insurance rates by enabling insurers to reduce the amount of reserves they need maintain to meet potential claims. They urge that because a statute of limitations in wrongful death actions which extinguishes a large number of claims before they accrue might substantially curtail malpractice exposure, the legislation should be construed in conformity with that end.

But section 340.5 evinces no such single-minded purpose. Instead, as originally worded, *the statute appears to have been a compromise between concern over the extended exposure of medical practitioners to malpractice liability and a desire not to bar potentially worthy plaintiffs from court before they have a fair chance to bring suit.* The

Legislature declined to adopt other proposals before it which held out the promise of substantially greater reductions in malpractice exposure and necessary insurance reserves. *Thus the Legislature did not date the limitation period from the "alleged wrongful act,"* as provided in one proposal. (Assem. Bill No. 135 (1969 Reg. Sess.).) *Instead, the limitation period was tied to "injury," a word of art which might refer to an event occurring some time after the commission of a "wrongful act."*

*Id.,* 135 Cal.Rptr. at 80, 557 P.2d at 512 (emphasis supplied).

In *Steingart v. Oliver,* 198 Cal.App.3d 406, 243 Cal.Rptr. 678 (1988), California's intermediate appellate court applied § 340.5 to a fact pattern quite similar to the one in this case. In 1982, Theresa Steingart, the plaintiff, noticed a lump in her right breast. On February 12, 1982, she went to Dr. John White, a gynecologist, who diagnosed the lump as a group of benign cysts, and told Steingart not to be concerned. Steingart, who was a registered nurse, questioned the doctor's diagnosis and requested a biopsy. But White told her that she did not need one. He then sent her to another doctor, Joseph Oliver, who confirmed White's diagnosis.

Steingart did not notice any change in the lump between 1982 and 1985. In 1985, however, she "noticed a change in the contour of the upper outer quadrant of her right breast." 198 Cal.App.3d at 410, 243 Cal.Rptr. at 679. In April of 1985, she was diagnosed with Stage II breast cancer, and had to undergo a radical mastectomy. On March 24, 1986, she filed her complaint against the physicians, alleging negligent misdiagnosis; suit was filed more than four years after White's examination but less than one year after the diagnosis of breast cancer.

The lower court held that the claim against White was barred by limitations, but the appellate court reversed. It noted the general rule that " 'the event which activates the three-year limitations period is the moment the plaintiff discovers the harm caused by the alleged negligence.' " *Id.,* 198 Cal.App.3d at 413, 243 Cal.Rptr. at 681 (quoting *Hills v.*

*Aronsohn,* 152 Cal.App.3d 753, 762, 199 Cal.Rptr. 816, 822 (1984)). Quoting the *Hills* case, the court added:

"We do not see how the rule can be otherwise. In a medical malpractice action, where an element of the cause of action is damages, a cause of action cannot accrue until the plaintiff has suffered some legally compensable injury. To adopt a rule that the statute begins to run on the date of the alleged negligence would mean that a plaintiff is denied all possibility of recovery simply because the injury did not manifest itself until sometime after three years from the date of the negligent act. Indeed, where the injury does not manifest itself within three years of the negligent act, a plaintiff would have no opportunity whatsoever to recover since the three-year period would effectively bar the action before the cause of action even accrued."

*Steingart,* 198 Cal.App.3d at 413, 243 Cal.Rptr. at 681 (quoting *Hills,* 152 Cal.App.3d at 762 n. 7, 199 Cal.Rptr. 816, 822 n. 7).

Applying these rules, the court concluded that Steingart's complaint was timely filed. As for the three year period, the court stated: "[I]t must be concluded [that] Steingart suffered no damaging effect or appreciable harm from White's asserted neglect until Newman discovered her cancer in April 1985." *Steingart,* 198 Cal.App.3d at 414, 243 Cal.Rptr. at 682. The court rejected the contention that Steingart suffered an injury when she knew about the lump: "[A]lthough Steingart knew about the lump at the time White examined her, such a condition is not a clear indication of injury, either damaging effect or appreciable harm." *Id.,* 198 Cal.App.3d at 415, 243 Cal.Rptr. at 682. As for the one year "discovery" period, the court held that there was "at minimum" a triable issue of fact: "Reasonable minds could easily conclude [that] Steingart did everything within her power to ascertain what, if any, illnesses she had after receiving White's initial diagnosis." *Id.,* 198 Cal.App.3d at 416, 243 Cal.Rptr. at 683.

As we see it, the view of the California courts, typified by *Steingart* and *Hills,* is essentially that an "injury" occurs when the patient "discovers" the harm caused by the physician's negligent act. We cannot adopt that view, because it would

effectively re-incorporate into C.J. § 5–109(a) the same open-ended discovery rule that the General Assembly sought to abolish. Moreover, such an interpretation would render meaningless the dichotomy between C.J. § 5–109(a)(1) and C.J. § 5–109(a)(2).[19] It would also contradict the Court's statement in *Hill v. Fitzgerald* that the five year period in C.J. § 5–109(a)(1) runs "without regard to whether the injury was reasonably discoverable." *Id.*, 304 Md. at 700, 501 A.2d 27. Therefore, appellants' contention that Ms. Edmonds did not suffer an "injury" until she began to experience pain or other symptoms from the cancer must fail.

---

19. At least two California courts have recognized that interpreting the word "injury" to mean "discovered" or "appreciable" harm in Cal.Civ. Proc Code § 340.5's three year cutoff provision could render the statute's one year discovery provision meaningless. *See Marriage and Family Center v. Superior Court*, 228 Cal.App.3d 1647, 1654, 279 Cal. Rptr. 475, 480 (1991) (criticizing the *Hills* interpretation and holding that "damage is 'manifested' for purposes of commencing the three-year period when it has become evidenced in some significant fashion, whether or not the patient/plaintiff actually becomes aware of the injury"); *Bispo v. Burton*, 82 Cal.App.3d 824, 830, 147 Cal.Rptr. 442, 445 (1978) ("If one were to simply lift the language from those cases concerning the definition of injury and apply it without analysis to all situations, the result would render the four-year limitation meaningless.")

One California court has attempted to remedy this problem by interpreting § 340.5 as follows: "First, the plaintiff must file within one year after she first 'discovers' the injury *and the negligent cause* of that injury. Secondly, she must file within three years after she first experiences harm from the injury." *Dolan v. Borelli*, 13 Cal.App.4th 816, 825, 16 Cal.Rptr.2d 714, 718 (1993) (emphasis in original).

The problems with this interpretation are two-fold. First, it causes the word "injury" to have two different meanings in the same statute: one meaning being "injury and the negligent cause," and the other meaning being "harm that is experienced." *Cf. Whack v. State*, 338 Md. 665, 673, 659 A.2d 1347 (1995) (when identical words are used in the same statute, it is presumed that they have identical meanings, but the presumption is rebutted "where it is apparent that the words used warrant the conclusion that they were employed in different parts with a different intent"). Second, the one year limitations period in § 340.5 does not speak of discovery of the injury "and the negligent cause." Rather, it only speaks of discovery of the "injury." The California court thus added words to the statute that are not there. Such an interpretation would violate settled Maryland principles of statutory construction. *See Claggett v. State*, 108 Md.App. 32, 41, 670 A.2d 1002, *cert. denied*, 342 Md. 330, 675 A.2d 992 (1996).

## C.

Appellees argue that, on the facts of this case, the failure to diagnose resulted in an immediate "injury" to Ms. Edmonds for purposes of C.J. § 5–109(a). Appellees' position rests on the premise that, in this case, the "injury" contemplated by C.J. § 5–109(a) necessarily occurred at the same time as the negligent act or omission. Our research reveals that Delaware subscribes to the view that the time of "injury" coincides with the time the negligent act was committed.

Like Maryland's, Delaware's statute of limitations in medical malpractice actions includes a discovery provision and focuses on the time of "injury." DEL.CODE ANN. tit. 18, § 6856 (1989) provides, in pertinent part:

No action for the recovery of damages upon a claim against a health care provider for personal injury, including personal injury which results in death, arising out of malpractice shall be brought after the expiration of 2 years from the date upon which such *injury* occurred; provided, however, that:

(1) Solely in the event of personal injury the occurrence of which, during such period of 2 years, was unknown to and could not in the exercise of reasonable diligence have been discovered by the injured person, such action may be brought prior to the expiration of 3 years from the date upon which such *injury* occurred, and not thereafter. . . .

(Emphasis supplied.)

The Delaware courts have construed the statutory phrase "injury occurred" as referring to the date when "the wrongful act or omission occurred." *Benge v. Davis*, 553 A.2d 1180, 1183 (Del.1989). The Delaware Supreme Court's decision in *Dunn v. Saint Francis Hospital, Inc.*, 401 A.2d 77, 80 (Del. 1979), illustrates the application of this rule. The plaintiff, Fred Dunn, had a back operation in 1970. In April 1975, he began to experience leg pain. In January 1977, he discovered that the leg pain might have been caused by the negligence of the doctors who performed the operation in 1970. When

Dunn filed suit in March 1977, the court held that his suit was barred by limitations. It concluded that "there is no doubt that the phrase 'injury occurred' refers to the date when the wrongful act or omission occurred," *i.e.,* the 1970 operation. *Id.,* 401 A.2d at 80. The court relied heavily on the purpose of the special statute of limitations to contain the "long tail" effect of the discovery rule. *Id.* at 79–80.

The court also rejected Dunn's contention that limitations did not begin to run until he began to experience pain in 1975. Dunn argued that, in the five preceding years, he had no "damages" that would be cognizable in a negligence action, and thus no "injury." The court said:

> The answer, however, must be that the statute was a response to a particular issue in a particular context and that to construe it broadly without the bounds of that context, as plaintiff desires, would emasculate its very purpose. Furthermore, if the General Assembly intended there to be a line of demarcation based on the no pain-no injury rationale, it would have said so in some precise manner. We cannot frustrate the clear legislative intent. . . .

*Id.,* 401 A.2d at 80.

The Delaware Supreme Court has since applied *Dunn*'s injury-equals-wrongful-act interpretation in cases involving alleged negligent misdiagnoses. *See Benge v. Davis,* 553 A.2d 1180 (failure to diagnose breast tumor); *Reyes v. Kent General Hospital, Inc.,* 487 A.2d 1142 (Del.1984). *Reyes* is notable, because it involved alleged negligent misdiagnosis of cervical cancer, and the issue was whether a wrongful death claim was time-barred. The court stated unequivocally: "The clear language of the statute dictates that whether the action be one for personal injury or personal injury resulting in death, the Statute of Limitations begins to run on the date of the alleged wrongful act or omission." *Id.,* 487 A.2d at 1145–46. *But cf. Pearson v. Boines,* 386 A.2d 651 (Del.1978) (doctor negligently told patient that she had multiple sclerosis, and she underwent

voluntary sterilization on his advice; *held,* "injury" occurred on date of sterilization).

We cannot accept the Delaware rule either. C.J. § 5–109(a)(1) does not date the five year limitations period from when the "wrongful act or omission" occurred. Instead, it specifically declares that the period begins to run on the date when the "injury was committed."

A comparison of C.J. § 5–109(a) with medical malpractice statutes of limitations in other jurisdictions illustrates the importance of this phraseology. Like Maryland, many states enacted special medical malpractice statutes of limitations during the medical malpractice insurance crisis of the 1970's. But most of these statutes use the date of the health care provider's "act" or "omission" as a reference point, and not the date of the patient's "injury." Some of these statutes contain both a "discovery" period and a longer "outer limit" period, and provide that the action must be filed within the time period that expires earlier. (*See* the statutes listed in Appendix A.) Other statutes that have attempted to counteract the "long tail effect" provide that limitations begins to run on the date of the "act" or "omission," but they do not include a discoverability clause. (*See* the statutes listed in Appendix B.)

In 1977, the American Bar Association's Commission on Medical Professional Liability recommended implementation of a statute of limitations requiring an action to be brought within two years from the date of the "incident which gave rise to the action," or one year from when the injury was discovered or reasonably should have been discovered, whichever occurred later, but in no event more than "eight years after the occurrence of the *incident which gave rise to the injury.*" (Emphasis supplied).

The Maryland Legislature could have followed the great majority of jurisdictions by enacting a statute providing for the commencement of limitations on the date of the defen-

dant's alleged "act" or "omission." [20] Such language would have compelled the conclusion that limitations begins to run from the date of the misdiagnosis. *See Humphreys v. Roche Biomedical Lab., Inc.*, 990 F.2d 1078, 1080 (8th Cir.1993) (interpreting Arkansas statute providing that suit must be filed within two years of the "wrongful act," except in cases of foreign objects; *held*, limitations began to run on the date of misreading of Pap smear). *But see Bonz v. Sudweeks*, 119 Idaho 539, 808 P.2d 876, 878–79 (1991) (interpreting statute requiring that suit be filed within two years of "the occurrence, act or omission complained of"; despite this language, limitations does not begin to run until plaintiff sustains "some damage"). Despite the plethora of statutes in other states to this effect, our Legislature did not adopt such a provision. Instead, it provided that the period specified in C.J. § 5–109(a)(1) would begin to run on the date the "injury" was committed.

In fact, while enacting amendments to C.J. § 5–109 in 1987, *see* 1987 Md. Laws, ch. 592, the General Assembly considered and rejected a proposal that would have brought the statute more in line with those in other jurisdictions. Senate Bill 225, as originally proposed, would have amended C.J. § 5–109(a)(1) to provide that the five year period would begin to run from the date of "the allegedly wrongful act or omission," rather than from the date when "the injury was committed." This amendment was proposed by the Governor's Oversight Committee on Liability Insurance, along with another proposal to

---

**20.** In addition to California and Delaware, the following states have medical malpractice statutes of limitation that use the patient's "injury" as a reference point: Nevada, *see* NEV.REV.STAT. ANN. § 41A.097 (Michie 1996) (action must be commenced not more than "4 years after the date of injury or 2 years after the plaintiff discovers or through the exercise of reasonable diligence should have discovered the injury, whichever occurs first"); Montana, *see* MONT.CODE ANN. § 27–2–205 (1995) (three years after the injury occurs or is discovered, but in no event more than five years "from the date of injury"); and West Virginia, *see* W. VA CODE § 55–7B–5 (1994) (two years after date of injury or date when injury should have been discovered, whichever occurs latest, but in no event more than "ten years after the date of injury").

change the limitations period for medical malpractice claims by minors. A briefing paper prepared by the Legislative Office of the Governor, explaining the proposed changes, stated, in part:

[T]he proposed legislation clarifies that the statute begins to run from the occurrence of the allegedly wrongful act or omission.

\* \* \* \* \* \*

The Court of Appeals has recently given an expansive reading to the term "injury" in § 5-109. The Court ruled in *Hill v. Fitzgerald,* 304 Md. 689, 501 A.2d 27 (1985), that an "injury" is committed on the date that the allegedly negligent act was first coupled with harm. Accordingly, it would be possible under this interpretation to bring an action for a harm that had not manifested itself for years after the negligent act. In some cases, this interpretation effectively negates the limitations period. Such unexpected expansions of risk exposure diminish predictability and pricing stability and, generally, contribute to the soaring premiums in the Maryland malpractice insurance marketplace.

\* \* \* \* \* \*

The proposed bill modifies current law ... [to] make it express that the statutory periods begin to run from the date of the "allegedly wrongful act or omission" in place of the common law term "injury."

This proposal, however, was deleted from the bill in the Senate Judicial Proceedings Committee. The Committee's report for the bill stated: "The intent of the deleted language was to overturn the decision of the Court of Appeals in *Hill v. Fitzgerald,* 304 Md. 689, 501 A.2d 27 (1985). In that case, the court ruled that an 'injury' is committed on the date the allegedly negligent act was first coupled with harm."

This history provides strong evidence that the General Assembly did not intend to create an ironclad rule that a medical malpractice claim would be barred if filed more than five years after the health care provider's wrongful act. Instead, as the California Supreme Court suggested in *Larcher*

*v. Wanless* in reference to that state's statute, the Legislature sought to balance two competing interests. First, it wished to combat the "long tail effect" on medical malpractice insurance. *See* Committee Report for Senate Bill 225, at 1 ("The intent of this bill is to promote predictability and pricing stability and reduce the huge increase in medical malpractice insurance premiums by shortening the 'long tail' for claims involving injury to minors."). Simultaneously, however, it wished to lessen the potential unfairness to victims of malpractice by not overly restricting their ability to present their claims. The Legislature reconciled these competing interests by providing that the five year "cutoff" period in C.J. § 5–109(a)(1) would begin to run on the date when the "injury" resulting from the health care provider's wrongful act or omission occurred, rather than from the date of that act or omission.

In sum, the General Assembly was evidently made aware of the potential ramifications of retaining the term "injury." Nonetheless, it elected to leave that language unchanged. Adopting the Delaware rule, therefore, would be to adopt a rule that the General Assembly has rejected.

### D.

Our analysis focuses on the concept of "injury," because the five year limitations period embodied in C.J. § 5–109(a) is triggered when the "injury" occurs. According to the Court in *Hill,* an injury occurs when "the negligent act [is] coupled with some harm [to create] a legally cognizable wrong." *Id.,* 304 Md. at 696, 501 A.2d 27.

In our view, a negligent misdiagnosis is not necessarily an "injury" for purposes of limitations; a wrongful "act" or "omission" is not the same as an "injury". Indeed, the two need not necessarily occur simultaneously.[21]

---

21. To illustrate, we offer the following examples. If someone throws a snowball at another person fifty yards away and injures that person, the "injury" occurs not when the perpetrator commits the act of throwing the snowball, but rather when it strikes the other person's body. Likewise, if someone carelessly leaves dynamite on a city sidewalk, a

The distinction between an injury and a wrongful act is reflected in the elements of a negligence claim, for which a plaintiff must plead and prove the following: (1) the defendant had a duty to protect the plaintiff from injury; (2) the defendant breached that duty; (3) the plaintiff suffered *actual injury or loss;* and (4) that injury or loss was the proximate result of the defendant's breach. *Baltimore Gas and Electric Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995); *Rosenblatt v. Exxon Co.,* 335 Md. 58, 76, 642 A.2d 180 (1994). Furthermore, in order to recover, the plaintiff's injury or loss must be proven with reasonable probability or certainty, and cannot be the subject of mere speculation or conjecture. *See Mount Royal Cab Co. v. Dolan,* 166 Md. 581, 584, 171 A. 854 (1934); *DiLeo v. Nugent,* 88 Md.App. 59, 76, 592 A.2d 1126, *cert. granted,* 325 Md. 18, 599 A.2d 90 (1991), *dismissed,* September 16, 1992. The Court of Appeals has also stated: "In a negligence claim, the fact of injury would seemingly be the last element to come into existence. The breach, duty, and causation elements naturally precede the fact of injury." *Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 121, 604 A.2d 47, *cert. denied,* 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992). *See also Hawley v. Green,* 117 Idaho 498, 788 P.2d 1321, 1325 (1990) ("In many medical malpractice cases, the damage occurs contemporaneously with the negligent act. . . . In some instances, however, the damage may not occur until some time after the negligent act" [citations omitted] ).

The California courts, in their interpretation of CAL.CIV. PROC.CODE § 340.5, *supra,* have also recognized the distinction between the health care provider's "act" and the patient's "injury." Although we disagree with their "appreciable harm" standard for determining when the injury occurs, we completely agree with their recognition of the distinction between the two concepts:

---

negligent "act" may have occurred, but an "injury" may not occur until much later, when the dynamite explodes and causes damage to persons or property.

"Wrongful act" and "injury" are not synonymous.... The word "injury" signifies both the negligent cause and the damaging effect of the alleged wrongful act and not the act itself.... The date of injury could be much later than the date of the wrongful act where the plaintiff suffers no physical harm until months or years after the wrongful act. *Steketee v. Lintz, Williams & Rothberg,* 38 Cal.3d 46, 210 Cal.Rptr. 781, 694 P.2d 1153, 1156 (1985).

To determine whether an "injury" has been "committed" so as to trigger the limitations period in C.J. § 5–109(a)(1), the touchstone of the inquiry is whether the patient has suffered harm that is "legally cognizable." In *Hill,* which involved an alleged negligent misdiagnosis, the Court held that, to activate the limitations period in C.J. § 5–109(a)(1), "all that is required is that the negligent act be coupled with some harm in order for a *legally cognizable wrong*—and, therefore, injury—to have occurred." *Id.,* 304 Md. at 696, 501 A.2d 27 (emphasis supplied).

Hill claimed that his doctor had negligently diagnosed him as having multiple sclerosis, when he actually had a spinal tumor. He contended that the incorrect diagnosis "was made as early as [Hill's] first visit on January 27, 1975 and certainly not later than February 14, 1975." *Id.,* 304 Md. at 692, 501 A.2d 27. The issue in the case was whether Hill suffered an "injury" after July 1, 1975, in which case C.J. § 5–109 would apply, or before that date, in which case the discovery rule would be applicable. The Court did not say that the "injury" occurred on the date of the negligent act. Instead, it stated: "Whether the original allegedly negligent misdiagnosis of Hill's condition caused some harm and therefore 'injury' prior to July 1, 1975 is a question of fact to be determined in light of the principles articulated in *Oxtoby* [*v. McGowan,* 294 Md. 83, 447 A.2d 860 (1982)]." *Hill,* 304 Md. at 697, 501 A.2d 27.[22]

---

**22.** We recognize, as we noted earlier, that the *Hill* Court, while commenting on the purpose of C.J. § 5–109, stated: "The purpose of the statute, readily evident from its terms, was to contain the 'long-tail' effect ... by restricting, in absolute terms, the amount of time that

In *Oxtoby,* the Court construed the word medical "injuries" in the effective date clause of the Health Care Malpractice Claims Act, C.J. §§ 3-2A-01 to 3-2A-09. The Act provided an effective date of July 1, 1976 and said it "shall apply only to medical injuries occurring on or after that date." 1976 Md. Laws., ch. 235, § 5. If the patient suffered a "medical injury" on or after the effective date, the claimant would have been required to submit to arbitration.

The defendant doctor in *Oxtoby* undertook to perform a total vaginal hysterectomy and bilateral salpingo-oophorectomy (the removal of both fallopian tubes and ovaries) in February 1974, in order to prevent the patient from developing ovarian cancer. The doctor allegedly failed to remove all of the left ovary and fallopian tube. The patient developed ovarian cancer in April 1977 and died in 1980.

The Court specifically rejected the definition of "injury" contained in § 7(1), comment *a* of the Restatement (Second) of Torts (1965), which stated that the "invasion of a legally protected interest" could constitute an "injury," even in the absence of harm. *Id.,* 294 Md. at 93, 447 A.2d 860. Instead, the Court said that "[t]he Act is concerned with the invasion of legally protected interests *coupled with harm." Id.,* 294 Md. at 93, 447 A.2d 860 (emphasis added). In describing the concept of "injury," the Court quoted from the Wisconsin case of *State ex rel. McManus v. Board of Trustees of Policemen's Pension Fund,* 138 Wis. 133, 119 N.W. 806, 807 (1909):

"The word 'injury,' in ordinary modern usage, is one of very broad designation. In the strict sense of the law, especially the common law, its meaning corresponded with its etymology. It meant a wrongful invasion of legal rights and was

---

could lapse between the allegedly negligent treatment of a patient and the filing of a malpractice claim related to that treatment." *Id.,* 304 Md. at 700, 501 A.2d 27. But this statement must be read in context. In two separate instances prior to this statement, the Court explicitly said that the triggering event for the five year period is not the negligent treatment but the "injury," *i.e.,* "the date upon which the allegedly negligent treatment was first coupled with harm." *Id.* Therefore, the date of the injury is not necessarily the date of the negligent treatment.

not concerned with the hurt or damage resulting from such invasion. It is thus used in the familiar law phrase *damnum absque injuria* [damage without violation of a legal right, for which no legal action will lie]. In common parlance, however, it is used broadly enough to cover both the *damnum* and the *injuria* of the common law, and indeed is more commonly used to express the idea belonging to the former word, namely, the effect on the recipient in the way of hurt or damage, and we cannot doubt that at this day its common and approved usage extends to and includes any hurtful or damaging effect which may be suffered by any one [sic]."

*Oxtoby,* 294 Md. at 94, 447 A.2d 860.

The Court concluded that, "in general, 'medical injuries' as used in the effective date clause refers to *legally cognizable* wrongs or damage arising or resulting from the rendering or failure to render health care." *Id.* (Emphasis supplied.) It added that the "concurrence of an invasion of [the decedent's] rights and of harm to [her]" would constitute a medical injury and an actionable tort. *Id.*

To set forth a viable claim for negligence, a plaintiff must allege, *inter alia,* "damages." For example, in *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 591 A.2d 544 (1991), *aff'd in part and rev'd in part on other grounds,* 326 Md. 107, 604 A.2d 47 (1992), we held that workers who claimed injuries from asbestos could not recover damages for "pleural plaques" or "pleural thickening," as medical experts had testified that those conditions had no health significance and did not cause any pain, dysfunction, symptoms, or other problems. *Id.,* 87 Md.App. at 732–35, 591 A.2d 544. We stated:

> To have a cause of action based on claims of product liability or negligence law submitted to the jury, the plaintiff must produce evidence of a legally compensable injury.
>
> \* \* \* \* \* \*

Sections 388 and 402A of The Restatement (Second) of Torts (1965) identify "harm" as one of the necessary elements of a cause of action in both negligence and strict

liability. The Restatement, 7(2), defines "[t]he word 'harm' [as] used throughout the Restatement ... to denote the existence of loss or detriment in fact of any kind to a person resulting from a cause." Comment b to section 7 further explains that " '[h]arm' implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object or thing.... In so far as physical changes have a detrimental effect on a person, that person suffers harm." These definitions, as used in the Restatement (Second) of Torts, have been cited with approval in Maryland.

*Id.,* 87 Md.App. at 734, 591 A.2d 544. Because of the clear and uncontradicted evidence that "pleural scarring does not cause a functional impairment or harm as defined in the *Restatement* § 7," we concluded that damages could not be awarded for pleural plaques or pleural thickening. *Id.* at 735, 591 A.2d 544.

In view of the foregoing authorities, we conclude that an "injury" within the meaning of C.J. § 5–109(a) is not "committed" unless, as a proximate result of the wrongful act, the patient sustains damages. Once damages are sustained, the health care provider's wrong is actionable, or "legally cognizable," within the meaning of *Hill* and *Oxtoby.*[23] As we see it, this is the most reasonable interpretation of C.J. 5–109(a), given its language and the interpretive case law.[24]

---

**23.** We recognize that there will not necessarily be a delay between the health care provider's negligent act and the resulting injury. We can certainly conceive of cases in which the negligent performance of a medical procedure causes legally cognizable damages immediately.

**24.** The Nevada Supreme Court adopted such a view in *Massey v. Litton,* 99 Nev. 723, 669 P.2d 248 (1983), when it considered a medical malpractice statute of limitations that is similar to Maryland's. NEV. REV.STAT. ANN § 41A.097 (1996) provides, in relevant part: "[A]n action for injury or death against a provider of health care may not be commenced more than 4 years after *the date of injury* or 2 years after the plaintiff discovers or through the exercise of reasonable diligence should have discovered the injury, whichever occurs first...." (Emphasis supplied.) The court construed the word "injury" in the statute

In appellees' view, the limitations clock began to tick at the moment of the alleged misdiagnoses in 1983. Yet if Ms. Edmonds had filed suit against appellees immediately after their allegedly negligent acts, her suit may have been dismissed for lack of damages or lack of damages that could be proven with reasonable certainty. *See Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 666, 464 A.2d 1020 (1983) ("highly likely" that risk of developing lung cancer as a result of asbestos exposure would be "too speculative to support a damage award"). According to appellees, however, the limitations period would continue to run and, if Edmonds filed suit once she sustained legally cognizable damages, her claim may have been beyond the five year window, and thus would have been dismissed on limitations grounds. It is plainly evident that appellees' interpretation could create a situation in which the limitation period runs before all the elements of a viable cause of action even exist. The plaintiff would be caught in an impossible "Catch–22" situation, because she would *never* be able to file suit; her suit would always be either premature or untimely.

Appellees' interpretation also flies in the face of the familiar principle of statutory construction that, in choosing between competing interpretations of a statute, "the court 'may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.'" *Maryland Automobile Insurance Fund v. Erie Insurance Exchange*, 105 Md.App. 377, 386, 660 A.2d 929 (1995) (quoting *Tucker v. Fireman's Fund Insurance Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986)). *See also Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994) ("we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense"); *Lemley v. Lemley*, 102 Md.App. 266, 291, 649 A.2d 1119 (1994) (same); *Reuter v. Reuter*, 102 Md.App. 212, 225, 649 A.2d 24 (1994) (same).

---

as meaning " 'legal injury,' i.e., all essential elements of the malpractice cause of action." Id., 669 P.2d at 250, 251. (Emphasis supplied).

The cases that appellees cite in support of their position that Ms. Edmonds suffered an immediate "injury" at the time of the alleged misdiagnosis are not persuasive. Appellees rely on *Oxtoby* to argue that an "injury" always occurs at the time of the physician's wrongful act. But, contrary to appellees' assertion, the Court in *Oxtoby* did not hold that the patient suffered an "injury" at the time of the failed surgery. The trial court found that the patient suffered a medical injury prior to July 1, 1976, and the Court held that, because the record was inadequate to permit review of the finding, the finding had to stand. *Id.*, 294 Md. at 92, 447 A.2d 860. The Court noted that the lower court's "ruling may well have been based on the evidence, alluded to by plaintiffs' counsel at the time, *that cancer developed in [the patient] before July 1, 1976.*" *Id.* (Emphasis supplied).[25]

Appellees also rely on our decisions in *Russo v. Ascher, supra,* 76 Md.App. 465, 545 A.2d 714 (1988) and *Dennis v. Blanchfield,* 48 Md.App. 325, 428 A.2d 80 (1981), *modified on other grounds,* 292 Md. 319, 438 A.2d 1330 (1982). These cases are distinguishable, however, because it appears that the patient in each case *had* incurred legally cognizable damages more than five years before filing her action. Thus, the issue of whether a patient could suffer injury in the absence of legally cognizable harm was not before the Court in either case.

In *Russo,* the patient filed a claim in 1985 with the Health Claims Arbitration Office, alleging that the defendant psychiatrist had negligently failed to diagnose a cyst in her brain during the course of her treatment from 1971 to 1982. The only test that could detect this type of cyst was a CAT scan. *Id.*, 76 Md.App. at 472, 545 A.2d 714. The psychiatrist's expert testified in a deposition that the CAT scan first became

---

**25.** In addition, it could also be argued that the patient in *Oxtoby* had a legally cognizable injury, and thus a cause of action in negligence, immediately after the operation. Because a portion of one of the ovaries sought to removed was left in her body, one could argue that she immediately had a cause of action in that she could have had another operation to remove it.

available as a diagnostic tool in 1978, and the patient failed to rebut this testimony. Therefore, we held that the five year limitations period in C.J. § 5–109(a)(1) had begun, at the latest, in 1978, when the psychiatrist allegedly failed to use a CAT scan to diagnose the patient's brain cyst. *Id.*

Appellees suggest that this holding means that a plaintiff invariably suffers an "injury" immediately upon a misdiagnosis. To the contrary, we made clear that the patient, "[d]uring the course of" her treatment by the psychiatrist from 1971 to 1982, "experienced headaches, vomiting, dizziness, a gait problem and recurrent episodes of falling," and that her "condition had been deteriorating for over eleven years to the point where she could not walk unassisted." *Id.*, 76 Md.App. at 467, 470–71, 545 A.2d 714. Thus, it appears that this Court assumed that the patient, around the time of the misdiagnosis in 1978, suffered legally cognizable damages, in the form of pain and discomfort, that she would not have suffered in the absence of the psychiatrist's negligence. Therefore, *Russo* does not alter our conclusion.

In *Dennis v. Blanchfield*, 48 Md.App. 325, 428 A.2d 80 (1981), the issue, as in *Oxtoby*, was whether the patient had suffered a "medical injury" on or after July 1, 1976, requiring submission of the claim to arbitration. The plaintiff, Blanchfield, asserted that, in March 1976, Dr. Dennis negligently misdiagnosed her as having incurable cancer. From March to April of 1976, she underwent chemotherapy, but the treatment had to be discontinued due to "the severity of the side effects." *Id.*, 48 Md.App. at 326, 428 A.2d 80. Blanchfield claimed that she sustained physical and mental suffering as a result of the erroneous diagnosis and treatment.

> She testified that the chemotherapy caused nausea, vomiting, diarrhea, and weakness. She further testified that the treatment caused an uncomfortable dryness of the mouth, nose, and eyes, and that she still suffered from this condition at the time of trial.... Mrs. Blanchfield testified that the diagnosis and treatment had caused her to become extremely nervous and that she had lived for months in a state of severe depression; she stated that she suffered

from chronic memory loss, an inability to concentrate, "head swims," and nightmares. A psychiatrist testified that she suffered from "anxiety depressive reaction," that this condition had been caused by the improper diagnosis and treatment, and that she would require some two years of psychotherapy to alleviate her condition. It was also testified, that during the period when she believed her death to be imminent, she broke off her engagement to be married and was forced by the side effects of the chemotherapy to quit her job as a school bus dispatcher. She testified that she had been unable to regain this job and that, as a result, she had lost wages.

*Id.*, 48 Md.App. at 327–28, 428 A.2d 80. We concluded that Blanchfield had sustained a medical injury prior to July 1, 1976, stating: "By April 27, 1976 [the last day of her chemotherapy treatments], the harm was done and the medical injuries had occurred." *Dennis*, 48 Md.App. at 330, 428 A.2d 80. Yet it is clear from the excerpt that we have quoted that Blanchfield had suffered harm, in the form of legally cognizable damages, prior to July 1, 1976.

The case of *Jones v. Speed*, 320 Md. 249, 577 A.2d 64 (1990), is to the same effect. The patient, Jones, claimed that Dr. Speed had negligently failed to diagnose her brain tumor. She "suffered from severe and often debilitating headaches" from 1975 until a brain tumor was discovered and removed in 1986. *Id.*, 320 Md. at 254, 577 A.2d 64. She was under the care of Dr. Speed from July 17, 1978 until September 16, 1985. Although the issue was not contested before the Court, the Court stated that Jones's claim for the alleged misdiagnosis on July 17, 1978 was barred by limitations. "[I]f one accepts the allegations of the plaintiffs, negligence producing an 'injury' within the meaning of the statute occurred on 17 July 1978.... Claims for that medical injury are therefore barred by § 5–109(a)(1)." *Id.*, 320 Md. at 255, 577 A.2d 64 (citations omitted).

But *Jones*, like *Russo* and *Dennis*, did not hold that a physician's negligent act automatically results in immediate "injury," even in the absence of legally cognizable damages.

First, the issue of the definition of "injury" was not before the Court. Second, Jones *did* apparently have legally cognizable damages immediately after her misdiagnosis, in the form of pain from her "severe and often debilitating headaches," that would not have occurred if Dr. Speed's diagnosis had been correct, as shown by the fact that surgical removal of her tumor in 1986 eliminated her symptoms. *Jones* is, therefore, also not inconsistent with our view.

Finally, appellees refer to our decision in *Johns Hopkins Hospital v. Lehninger*, 48 Md.App. 549, 429 A.2d 538 (1981). But we did not hold there that an "injury" automatically occurs immediately upon misdiagnosis. The plaintiff, Lehninger, fractured his hip in a fall in 1971. He filed suit in 1979, claiming that, the day after the fall, the hospital negligently diagnosed his fracture as a bruise, causing him to walk around with "chronic severe pain" for three days before falling again. He also claimed that, after a surgical procedure on the hip in 1973, the hospital negligently assured him that he would not develop a bone condition called "avascular necrosis," in which the bone deteriorates due to a disruption of the blood supply. Lehninger had no difficulties until he began to experience symptoms of avascular necrosis in 1977.

The hospital contended that the claim should have been submitted to arbitration. Although the hospital *conceded* that Lehninger had suffered a "medical injury" prior to July 1, 1976, it argued that arbitration was required because (1) Lehninger's claim was *filed* after July 1, 1976, and (2) the injuries continued to manifest themselves after July 1, 1976. *Id.*, 48 Md.App. at 556–57, 429 A.2d 538. Based on the hospital's concession, the issue of the date when Lehninger's injury first occurred was not before us. Moreover, we stated that Lehninger had suffered "chronic severe pain" after the alleged misdiagnosis in 1971—pain that would constitute legally cognizable damages.

We cannot ignore *Newell v. Richards, supra*, 323 Md. 717, 594 A.2d 1152 (1991), although the parties have not referred to it. There, the Court concluded that the burden of proof with

respect to limitations in a medical malpractice case is on the health care provider. It stated:

[T]he health care provider ha[s] the burden of pleading and proving that the claimant's action is time-barred by either of the two statutory provisions. If a health care provider pleads and proves that an action was filed after five years from *the alleged negligent act*, the action is time-barred. If suit is brought within the five-year limitations period, the action will still be barred if the health care provider pleads and proves that the claim was not brought within three years of the date when "the injury was discovered."

*Id.,* 323 Md. at 728, 594 A.2d 1152 (emphasis added).

■ While the foregoing statement in *Newell* could be read to say that the five year limitations period in C.J. § 5–109(a)(1) runs from the date of the health care provider's "negligent act," the issue of when an "injury" is committed within the meaning of the statute was not before the Court in *Newell. See id.,* 323 Md. at 724–25, 594 A.2d 1152. We do not regard *Newell* as overruling the principles of *Hill* and *Oxtoby,* which make clear that there must be an "injury" in addition to the "negligent act" in order for the limitations period in C.J. § 5–109(a)(1) to begin to run. As we have stated, *"[S]tare decisis* is ill served if readers hang slavishly on every casual or hurried word as if it had bubbled from the earth at Delphi. *Obiter dicta,* if noticed at all, should be taken with a large grain of salt." *State v. Wilson,* 106 Md.App. 24, 39, 664 A.2d 1, *cert. denied,* 340 Md. 502, 667 A.2d 342 (1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 2521, 135 L.Ed.2d 1046 (1996). *See also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993) ("we think it generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code").

To be sure, we make no judgments about the General Assembly's ability to declare that limitations shall run from the date of the health care provider's wrongful act, regardless of the existence of legally cognizable damages. For example,

in C.J. § 5–108(b), it has provided that no action may be brought against an architect, engineer, or contractor for injuries caused by the defective condition of an improvement to real property if the injury "occurs more than 10 years after the date the entire improvement first became available for its intended use." We hold only that the Legislature did not express such an intention in this case. The Legislature is, of course, free to amend the statute.

We emphasize, however, that we are *not* re-introducing a discovery rule into C.J. § 5–109(a)(1); the Legislature specifically abolished the discovery rule when it enacted that provision. But, the five year limitations period begins to run from the time of injury; that occurs when the patient sustains legally cognizable damages, even if the damages are hidden, undiscovered, and undiscoverable. *See Hill, supra,* 304 Md. at 700, 501 A.2d 27 (limitation period runs "without regard to whether the injury was reasonably discoverable or not").[26]

 In addition, we reiterate the rule from the preceding case law that the five year period begins to run when injury (or "damages") *first* arises, and not when *all* damages resulting from the physician's negligence have arisen. The *Hill* Court stated that all that is required for an injury to exist "is that the negligent act be coupled with *some* harm." *Id.,* 304 Md. at 696, 501 A.2d 27 (emphasis supplied). The other cases that we have discussed have also made clear that the date of the injury is the date when the injury first arises, even if all of the resulting damages do not occur until later. *See Oxtoby, supra,* 294 Md. at 97, 447 A.2d 860 ("a medical injury occurs, within the meaning of the effective date clause, even though all of the resulting damage to the patient has not been suffered prior to the Act's effective date"); *Lehninger, supra,* 48 Md.App. at 556–57, 429 A.2d 538 (Health Care Malpractice Claims Act did not apply, because injury occurred prior to

---

**26.** A cause of action in negligence may "arise"—in the sense that facts exist to support each element—before the cause of action is discovered or discoverable. *See Owens–Illinois v. Armstrong, supra,* 326 Md. at 121, 604 A.2d 47.

effective date of Act, even though injuries "continued to manifest themselves after the Act's effective date"); *Dennis, supra,* 48 Md.App. at 330, 428 A.2d 80 ("By April 27, 1976, the harm was done and the medical injuries had occurred. That the effects of those injuries continued to be felt by Mrs. Blanchfield thereafter is irrelevant.")

## CONCLUSION

■ A patient sustains an "injury" within the meaning of C.J. § 5–109(a)(1) when, as a result of the tort, he or she first sustains compensable damages that can be proven with reasonable certainty. *See Davidson v. Miller,* 276 Md. 54, 62, 344 A.2d 422 (1975); *Straughan v. Tsouvalos,* 246 Md. 242, 257, 228 A.2d 300 (1967). Therefore, the patient could suffer an "injury" as a result of a negligent misdiagnosis, when (1) he or she experiences pain or other manifestation of an injury; (2) the disease advances beyond the point where it was at the time of the misdiagnosis and to a point where (a) it can no longer effectively be treated, (b) it cannot be treated as well or as completely as it could have been at the time of the misdiagnosis, or (c) the treatment would entail expense or detrimental side effects that would not likely have occurred had treatment commenced at the earlier time; or (3) the patient dies. This is not, of course, an exhaustive checklist; the overriding inquiry in all cases must be when the patient first sustained legally compensable damages. In any event, the injury occurs, as we have observed, when legally compensable tort damages *first* occur, regardless of whether those damages are discoverable or undiscoverable.

In the instant case, the trial judge determined, as a matter of law, that Debra Edmonds suffered an "injury" at the moment of the alleged misdiagnoses in 1983. Given the posture of a summary judgment proceeding, and in light of the evidence proffered by appellants, the court erred. Dr. Rocereto testified that it was not possible to determine the point between 1983 and 1988 when the cervical cancer spread to other sites in Ms. Edmonds's body:

Q: Can you tell me if you are able to stage her disease in December of 1984 what stage she was in at that point?

A: *That's impossible.*

\* \* \* \* \* \*

Q: If we assume that 75 to 85 percent cure ratio in 1983 and zero in 1989, can you tell me what her cure rate would have been in 1984?

A: Now, are you asking me if it was diagnosed at that time or if she had proper treatment?

Q: Diagnosed?

A: In 1983.

Q: Diagnosed?

A: *I have no records to help me on that so I really can't tell you where the tumor was at that time.*

Q: Untreated.

A: I still can't tell you.

Q: You can't tell me what stage her disease would have been in 1984.

A: There is—no, I can't. *I can assume it was the same, hadn't progressed much. It's impossible. There's no records that give me any hint at all on that. The only other time I can tell you when the—about the disease is when nerve root involvement was involved.*

Q: When was that?

A: That was about a year or two before she was diagnosed.

(Emphasis supplied.)

Dr. Rocereto also indicated that this inability stems in part from the nature of cancer:

Q: There's no rule you can look at through your experience to work our way backwards from 1989?

A: No.... [C]ancer in one instance may spread rapidly and in other instances may be very slow growing, *may lay dormant,* so someone that does have a very early stage cancer that's undetected in one year, five years later may be the same then suddenly a year later has a lot of discomfort

and advancing cancer. It's one of those things about cancer we don't understand completely.

(Emphasis supplied.) He later testified: "[T]here obviously was a microscopic tumor present and that tumor may have been spreading all those years as microscopic disease very slowly, *it may have been sitting dormant somewhere.*" (Emphasis supplied).

In addition, Dr. Stanley Burrows testified at his deposition:

I can only say, certainly at the time she was seen at Georgetown she was incurable. I am suspicious she may have been incurable, or at least have a much lower probability of cure, as early as December '84, but I can't say that with any certainty. Perhaps I am going out on a limb even raising that particular date.

Appellants did not proffer any expert opinion that Ms. Edmonds's cancer had not spread at any time prior to April 9, 1988 (i.e., the date five years prior to the filing of the claim) or April 11, 1985 (i.e., the date five years prior to Ms. Edmonds's death). But appellees did not advance any evidence, beyond conclusory assertions, to show that Ms. Edmonds's cancer *had* advanced during those time periods. Nor do appellees contend that Edmonds suffered any symptoms from the cancer prior to August 1988. Therefore, we conclude that the circuit court erred in ruling, as a matter of law, that appellant's claims were time-barred under the five year limitations provision in C.J. § 5–109(a)(1).[27]

**SUMMARY JUDGMENT VACATED.**

**CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**

---

27. Appellees do not argue in their briefs that either of appellants' claims were time-barred under the three year "discovery" period in C.J. § 5–109(a)(2). Therefore, we shall not consider whether the claims were barred on that ground.

## APPENDIX A

The following twenty-two medical malpractice statutes of limitation include a discoverability clause, but also use the health care provider's "act" or "omission" as a reference point:

ALA.CODE § 6–5–482 (1983): action must be brought within two years after "act, omission, or failure" or within six months after wrong was discovered or should have been discovered; but in no event more than "four years after such act."

COLO.REV.STAT. ANN. § 13–80–102.5 (West 1989): two years after cause of action accrues, but in no event more than three years after "the act or omission which gave rise to the action," except in cases of fraud or foreign objects.

CONN. GEN.STAT. ANN. § 52–584 (West 1991): two years from date when injury is sustained, discovered, or should have been discovered, but not more than three years from the "date of the act or omission complained of."

FLA. STAT. ANN. § 95.11(4)(b) (West 1982): two years from the "incident" or two years from date the incident is discovered or should have been discovered; but in no event more than three years from the date of the "incident or occurrence."

GA.CODE ANN. § 9–3–71(b) (1995): five year statute of repose, capped by "date on which the negligent or wrongful act or omission occurred."

ILL. ANN. STAT. ch. 735, para. 5/13–212(a) (Smith–Hurd 1992): two years after patient knew or should have known of injury, but in no event more than four years after the "act or omission or occurrence."

IOWA CODE ANN. § 614.1(9) (West Supp.1996): two years after patient knew or should have known of injury, or death occurs; but in no event more than six years after "the act or omission or occurrence," except in cases of foreign bodies.

KAN. STAT. ANN. § 60–513(c) (1994): two years after "occurrence of the act" or the injury becomes "reasonably ascertainable," whichever is later; but in no event more than four years after the "act."

KY.REV.STAT. ANN. § 413.140(2) (Baldwin 1991): one year after injury discovered or should have been discovered, but in no event more than five years from "the alleged negligent act or omission."

LA.REV.STAT. ANN. § 9:5628 A (West Supp.1996): one year from act or discovery of act, but in no event more than three years "from the date of the alleged act, omission, or neglect."

MASS. ANN. LAWS ch. 260, § 4 (Law.Co-op.1992): three years after "the cause of action accrues," but in no event more than seven years after "occurrence of the act or omission," except in cases of foreign objects.

MICH. COMP. LAWS ANN. § 600.5838a (West Supp.1996): two years from "the act or omission" or six months after the patient discovers or should have discovered existence of claim, whichever is later; but in no event more than six years after the "act or omission."

NEB. REV. STAT. § 44–2828 (1993): two years after act, or date when the cause was discovered or should have been discovered; but in no event more than ten years "after the date of rendering or failing to render such professional service which provides the basis for the cause of action."

N.C. GEN. STAT. § 1–15(c) (1994): outer limit of four years "from the last act of the defendant giving rise to the cause of action."

N.D. CENT.CODE § 28–01–18(3) (1991): two years after "claim for relief has accrued," but no more than six years after the "act or omission of alleged malpractice," except in cases of fraud.

OHIO REV.CODE ANN. § 2305.11(B) (Supp.1995): one year "after the cause of action accrued," but in no event more than four years after "the occurrence of the act or omission."

OR. REV. STAT. § 12.110(4) (1995): two years from when injury was discovered or should have been discovered, but no more than five years after "treatment, omission, or operation," except in cases of fraud.

S.C.CODE ANN. § 15–3–545 (Law.Co-op.Supp.1996): three years from date of "treatment, omission, or operation" or date injury was discovered; but in no event more than six years from "date of occurrence."

TENN.CODE ANN. § 29–26–116 (1980): one year from discovery, but in no event more than three years after the "negligent act or omission."

UTAH CODE ANN. § 78–14–4 (1992): two years after plaintiff discovers or reasonably should have discovered "the injury," whichever comes first; but in no event more than four years after "the alleged act, omission, neglect or occurrence."

WASH. REV.CODE ANN. § 4.16.350 (West Supp.1996): three years after "act or omission" or one year from when injury was discovered or reasonably should have been discovered, whichever is latest; but in no event more than eight years after the "act or omission."

WIS. STAT. ANN. § 893.55 (West 1983): three years from "date of the injury" or one year from when the injury was discovered or reasonably should have been discovered; but not more than five years "from the date of the act or omission."

We observe that the statutes in Kentucky, Ohio and Colorado are no longer valid, as the highest courts of those states have declared the statutes unconstitutional. *See McCollum v. Sisters of Charity of Nazareth Health Corp.,* 799 S.W.2d 15 (Ky.1990) (statute unconstitutional as a violation of the "open courts" provision of the Kentucky constitution); *Hardy v. VerMeulen,* 32 Ohio St.3d 45, 512 N.E.2d 626 (1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988) (patient did not discover injury until eleven years after the surgical procedure at issue; statute of repose violated "open courts" guarantee, as it "unconstitutionally locks the courtroom door before the injured party has an opportunity to open it"); *Austin v. Litvak,* 682 P.2d 41 (Colo.1984) (statute of repose violated equal protection; no rational basis for giving the benefit of the discovery rule only to patients alleging fraud

or the negligent leaving of a foreign object in their bodies, and not to any other classes of patients).

## APPENDIX B

The following ten medical malpractice statutes of limitation provide that the limitations periods begin to run on the date of the health care provider's "act" or "omission," without regard to the date of the injury or its discoverability:

ARK.CODE ANN. § 16–114–203 (Michie Supp.1996): two years of "wrongful act," except in cases of foreign objects.

IND.CODE ANN. § 27–12–7–1(b) (Burns 1994): two years "after the date of the alleged act, omission, or neglect."

ME.REV.STAT. ANN. tit. 24, § 2902 (West 1990): three years after "the date of the act or omission giving rise to the injury," except in cases of foreign objects.

MO. ANN. STAT. § 516.105 (Vernon Supp.1996): two years from "the date of occurrence of the act or neglect complained of," except in cases of foreign objects.

N.H.REV.STAT. ANN. § 507–C:4 (1983): two years from "the act, omission or failure complained of," except in cases of foreign objects.

N.M. STAT. ANN. § 41–5–13 (1991): three years "after the date that the act of malpractice occurred."

N.Y. CIV. PRAC. L. & R. 214–a (McKinney 1990): two years and six months from "the act, omission or failure complained of," except in cases of foreign objects.

S.D. CODIFIED LAWS § 15–3–545 (Supp.1996): two years after the "alleged malpractice, error, mistake or failure to cure."

TEX. REV. CIVIL STAT. ANN. art. 4590i, § 10.01 (West Supp. 1996): two years "from the occurrence of the breach or tort."

V.I.CODE ANN. tit. 27, § 166d (1993): two years from "the alleged act, omission or neglect," except in cases of foreign objects and concealment.

At least two of these statutes have also been declared unconstitutional. *See Nelson v. Krusen,* 678 S.W.2d 918 (Tex. 1984) (statute violates "open courts" provision of Texas constitution); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 833 (1980) (statute violates equal protection clause of New Hampshire constitution; "the legislature may not abolish the discovery rule with respect to any one class of medical malpractice plaintiffs").

In addition, the Idaho Legislature enacted a statute, IDAHO CODE § 5–219(4) (1990), that provides that the two year limitations period begins to run at "the time of the occurrence, act or omission complained of." Notwithstanding this language, the Idaho Supreme Court has interpreted the statute as meaning that the period does not begin to run at the time of the wrongful act "unless some damage has occurred." *Hawley v. Green,* 117 Idaho 498, 788 P.2d 1321, 1325 (1990) (quotation omitted); *Bonz v. Sudweeks,* 119 Idaho 539, 808 P.2d 876, 878 (1991). Otherwise, the statute begins to run "only when there is objective proof that would support the existence of some actual damage." *Chicoine v. Bignall,* 122 Idaho 482, 835 P.2d 1293, 1298 (1992). The court has reasoned that reading the statute literally could produce "an absurd result," because a negligence cause of action "does not accrue until the fact of injury becomes objectively ascertainable." *Davis v. Moran,* 112 Idaho 703, 735 P.2d 1014, 1020 (1987).